IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**MICHAEL BERRYMAN,**

      **Plaintiff,**

**v.**                                                                        **Civil Action No. 1:16cv47**
                                                                           **(Judge Keeley)**

**OFFICER MULLEN, BOP Officer;**
**OFFICER JOHN DOE 1, BOP Officer;**
**OFFICER JOHN DOE 2, BOP Officer;**
**OFFICER LT. RIFFLE, BOP Officer;**
**OFFICER BROWN, BOP Officer;**
**OFFICER BRADY, BOP Officer;**
**FOUR UNKNOWN BOP OFFICERS;**
**and P.A. C. MEYER, Physician's Assistant,**

      **Defendants.**

## REPORT AND RECOMMENDATION

### I. Introduction

On March 23, 2016, the *pro se* Plaintiff, then an inmate at FCI Fairton in Fairton, New Jersey, initiated this case by filing a Bivens[1] civil rights complaint against the above-named Defendants. ECF No. 1. Along with his complaint, he filed a motion to proceed as a pauper, a Consent to Collection of Fees from Trust Account, and a copy of the Ledger Sheets to his Trust Account. ECF Nos. 2, 3 & 4. Pursuant to a Notice of Deficient Pleading, on April 4, 2016, Plaintiff filed a copy of his Prisoner Trust Account Report. ECF No. 8. On June 23, 2016, Plaintiff filed a request for jury demand. ECF No. 12. By Order entered July 20, 2016, Plaintiff was granted permission to proceed as a pauper and directed to pay an initial partial filing fee ("IPFF"). ECF No. 14. Plaintiff paid his IPFF on August 8, 2016. On August 18, 2016, Plaintiff

---

[1] Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

moved for an extension of time in which to pay his IPFF; the motion was denied as moot on August 22, 2016. ECF Nos. 19 & 20.

On September 28, 2016, the undersigned conducted a preliminary review of the complaint and determined that summary dismissal was not warranted at that time. Therefore, the undersigned directed the Defendants to answer the complaint; Plaintiff was given an additional thirty days in which to identify the John Doe defendants; and the Clerk was directed to issue 60-day summonses and forward copies of the complaint to the United States Marshal Service to effect service of process upon the remaining named defendants. ECF No. 22.

On October 26, 2016, by separate motions, Plaintiff moved for an extension of time in which to identify the John Doe defendants and to compel discovery. ECF Nos. 28 & 29.  By separate Orders entered October 31, 2016, Plaintiff's motion to compel discovery was denied as premature and his motion to extend the time in which to identify the John Doe defendants was granted. ECF Nos. 30 & 31. On November 3, 2016, Plaintiff filed a motion/request for the court to review his new information and for appointed counsel.  ECF No. 32.  By Order entered November 8, 2016, Plaintiff's motion for appointed counsel was denied. ECF No. 34. On November 14, 2016, Plaintiff moved to temporarily waive service of the complaint and summonses on the John Doe defendants.  ECF No. 35.  By Order entered November 15, 2016, Plaintiff's motion to temporarily waive service of the complaint and summonses on the John Doe defendants was construed as a second motion for an extension of time in which to identify the John Doe defendants and granted.  ECF No. 36.  On November 22, 2016, the Defendants moved for an extension of time and consolidated response date; by Order entered the following day, the motion was granted.  ECF Nos. 40 & 41.  On January 18, 2017, the Defendants moved for

another extension of time and consolidated response date; by order entered January 24, 2017, the motion was granted. ECF Nos. 48 & 49.

On February 22, 2017, the defendants filed a Motion to Dismiss or in the Alternative, Motion for Summary Judgment, with a memorandum in support. ECF Nos. 51 & 52.  Because Plaintiff was proceeding *pro se*, a <u>Roseboro</u> Notice was issued on March 1, 2017.  ECF No. 53. On March 27, 2017, Plaintiff filed his response, styled as a Motion to Dismiss or Motion to Stay the Defendant's Motion to Dismiss or for Summary Judgment, attaching a sworn declaration. ECF Nos. 56 & 56-1. The motion was also docketed as a second motion for discovery. ECF No. 57.  By Order entered April 24, 2017, the second motion for discovery was also denied as premature.  ECF No. 58.

## II. <u>The Pleadings</u>

### A. <u>The Complaint</u>

In the complaint, the Plaintiff raises failure to protect, conditions of confinement, denial of due process, and deliberate indifference to serious medical needs claims, arising out of a May 8, 2014 assault upon him at USP Hazelton by V.A., an inmate with a known history of attacking cellmates.

Plaintiff contends he repeatedly advised the Defendants of V.A.'s stated threats to attack or kill him if he did not get moved out of their cell, and the Defendants refused to move him. After he was finally attacked and injured, he alleges the Defendants denied him medical care altogether or only provided inadequate care.  Further, he contends his due process rights were violated when the Defendants confiscated all his personal belongings, including his legal papers, and confined him in punitive segregation for 11 days after the attack, without providing him a due process hearing, leaving him with only paper clothing and bedding, and no hygiene products.

Plaintiff avers that he now has 4 protruding disks in his lower lumbar back area with severe stenosis; lower lumbar thecal sac encroachments; a lumbar slipped disk; cervical spine stenosis from C6-C7; disk herniation moderately encroaching upon the thecal sac at the C3-4 level; "hard disks/osteophyt [sic] complex thecal sac encroaching" C6-7; and evidence of remote rib fractures with rib deformity in the lower left ribs. Id. at 17.

The Plaintiff maintains that he has exhausted his administrative remedies with regard to his claims. Id. at 6 & 8; see also ECF No. 1-1 at 1 - 5.

As relief, he requests Three Million Dollars ($3,000,000.00) in compensatory and punitive damages; attorney's fees and costs, and injunctive relief in the form of a declaration that the Defendants' acts and omissions violated his constitutional rights.

**B. Defendants' Motion to Dismiss or in the Alternative, Motion for Summary Judgment**

In their dispositive motion, the Defendants allege that the case should be dismissed or summary judgment granted in their favor because:

1)  Defendants are entitled to qualified immunity [ECF No. 52 at 6];

2) Defendants did not fail to protect Plaintiff from the assault; Plaintiff never warned staff that the inmate had threatened to attack him and the officers never noticed anything amiss on their twice-per-hour or at least every 40 minute rounds in the SHU; and there is no record in Plaintiff's Central File of any requests for protective custody or separation assignments.  Id. at 8 – 11.

3) Plaintiff's conditions of confinement claims do not state an Eighth Amendment claim [id. at 11 – 12];

4) Defendant Meyer must be dismissed from suit because as a Public Health Service member, he is immune from liability.  Id. 12.

5) Defendants were not deliberately indifferent to Plaintiff's medical condition and provided reasonable, timely, and appropriate care at all times.  Id. at 13.

**C. Plaintiff's Response**

In Plaintiff's his motion to dismiss or stay the Defendants' dispositive motion, Plaintiff reiterates his request to conduct limited discovery. He contends that "all or most" of his records and documents pertaining to this case were stolen and/or destroyed by others, because he was labeled a "rat" for filing this civil action; and that three other inmates wrote declarations on his behalf and he is certain that they will rewrite those declarations for him.  ECF No. 56 at 1 - 2. He avers that inmate J.N. was the third victim of the inmate who attacked him and that Plaintiff was the fourth.  Id. at 2. Finally, he asks the Court to dismiss or stay the Defendants' dispositive motion. Id.

In his attached declaration, Plaintiff reiterates his claims and arguments and attempts to refute the Defendants' sworn affidavits by asserting that the facts stated in the declarations are false and misstated in many respects. ECF No. 56-1 at 1 – 7.

### III. <u>Standard of Review</u>

#### A. <u>Motion to Dismiss</u>

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1356 (1990). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. <u>Mylan Labs, Inc. v. Matkari</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)).

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of

what the ... claim is and the grounds upon which it rests.'" <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts have long cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitled him to relief." <u>Conley</u>, 355 U.S. at 45-46. In <u>Twombly</u>, the United States Supreme Court noted that a complaint need not asserts "detailed factual allegation," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Twombly</u>, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," <u>id.</u> (citations omitted), to one that is "plausible on its face," <u>id.</u> at 570, rather than merely "conceivable," <u>Id.</u> Therefore, in order for a complaint to survive a dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." <u>Bass v. E.I. DuPont de Nemours & Co</u>., 324 F.3d 761, 765 (4th Cir. 2003) (citing <u>Dickson v. Microsoft Corp</u>., 309 F.3d 193, 213 (4th Cir. 2002); <u>Iodice v. United States</u>, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in <u>Ashcroft v. Iqbal</u>, where it held that a "claim had facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. <u>Id.</u>

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

**B. <u>Summary Judgment</u>**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex</u>, 447 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Electric Indus. Co. v. Zenith Radio Corp</u>., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. <u>Id.</u> This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson,</u> 477 U.S. at 256.

The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. <u>Id.</u> at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." <u>Id.</u>  "If the evidence is merely colorable, or is not significantly probative, summary judgment

7

may be granted." <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. <u>Anderson</u> at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita,</u> 475 U.S. at 587 (citation omitted).

## IV. <u>Analysis</u>

### A. <u>Qualified Immunity and Plaintiff's Failure to Protect Claim</u>

Plaintiff contends that Plaintiff contends that on an unspecified date he was placed into a cell with inmate V.A. On May 6, 2014, V.A. told Plaintiff to get out of "his cell," directed Plaintiff to tell the range officer to move him "or he would hurt . . . [him] bad like he had done his last 3 cell-mates." ECF No. 1 at 11. Plaintiff avers that he already knew, from being told by a previous inmate victim of V.A., that V.A. would follow through on his threats to attack, so he told V.A. that he would ask to be moved. <u>Id.</u> Plaintiff told Officer John Doe I of V.A.'s threats to harm or kill him; Officer John Doe I then told Officer John Doe II, who contacted Lt. Riffle, but Lt. Riffle would not permit Plaintiff to be moved. <u>Id.</u> Plaintiff reiterated his plea for protection to Officer John Doe II to no avail. <u>Id.</u> Plaintiff asserts that in response to his continued pleas, John Doe II then yelled at V.A., telling him that Plaintiff was an old man and that V.A. "better not put his hands on him," then smiled, assured Plaintiff that he would be alright, and walked away. <u>Id.</u>

The next day, V.A. told Plaintiff that he had to move or V.A. would "hurt . . . [him] bad if not kill . . . [him] today if . . . [Plaintiff] did not get moved befor [sic] midnight." <u>Id.</u> The next time Officer John Doe II came onto the range, Plaintiff again pleaded to be moved because of V.A.'s threats. He advised Officer John Doe II that he had been threatened and picked on all

night; John Doe II told Plaintiff that he would not be moved, then smiled and walked away.  Id. at 11 – 12.  The next time John Doe II came through, Plaintiff again told him he needed to be moved, and John Doe II replied "I told you no." Id. at 12. Inmate V.A. then told Officer John Doe II "get him out of my cell" or he would find Plaintiff "on the floor like the other 3 before." Id.  Officer John Doe II told Plaintiff "I guess you better fight or fxxk [sic] Berryman," laughed, and walked away. Id. Plaintiff contends that he tried to stop Officer John Doe II whenever he passed by on rounds that day, begging to be moved, but Officer John Doe II just smiled and walked past. Id. Hearing this, inmates in nearby cells began taunting Plaintiff, calling him "bitch, check-in, rat, child-molester" etc., and urging V.A. to kill Plaintiff.  Id.

That evening, Inmate V.A. received a letter containing a copy of his father's obituary; he became agitated and again threatened to kill Plaintiff.  Id. Inmate V.A. asked Officer Brown to permit him to use the phone, but Brown refused to talk to V.A. because V.A. was cursing and belligerent. Id. Inmate V.A. then began repeatedly pushing the emergency call button, requesting to see psychology and to have Plaintiff moved from his cell.  Id. Officer Brown returned and directed V.A. to stop pushing the button or "he would regret it." Id. Plaintiff again pleaded to be moved but was ignored. Id. Inmate V.A. continued to curse Officer Brown and push the emergency button; Brown left and returned with unknown officers, ordered V.A. to cuff up and he refused. Id. at 12 – 13.  Plaintiff offered to cuff up, hoping to be removed first, but the officers refused, saying V.A. had to be cuffed first "because he had a history of attacking his cell-mates when they where [sic] cuffed up," which was unknown to Plaintiff at that time. Id. at 13.  When Inmate V.A. finally submitted to being cuffed, Plaintiff was also cuffed; they were then escorted by Four Unknown BOP Officers to a holding cell across from the control module; Plaintiff was uncuffed first, then V.A.; they were stripped, searched, given paper clothing, and cuffed again.

9

Id. Plaintiff told the Four Unknown BOP Officers and Officer Brady that they could not place him back in the cell with V.A., and Officer Brady responded "O[] [sic] you will go back into the cell with him" and smiled. Plaintiff and V.A. were escorted back to the cell with Plaintiff begging for protection *en route* the whole way.  Id. The two inmates were placed back into their cell, which had been stripped of everything except for the two mattresses, now with paper sheets; all of the inmates' personal belongings, legal material, and hygiene products were gone. Id. at 14. Inmate V.A. told Plaintiff he was going to take the bottom bunk and Plaintiff could sleep on the floor. Id. at 13. Plaintiff contends that V.A. again warned that he had "till the late shift [to] get out of . . . [V.A.'s] cell, by midnight or . . . [V.A.] would put . . . [him] into the hospitle [sic]. And [sic] . . . [V.A.] would rape . . . [him], like he did to [the] others." Id. at 14. When Officer Mullen made rounds after the shift changed, Plaintiff stopped him and told him he had to be rehoused because he was in fear for his life; Mullen apologized but told Plaintiff he had orders not to move him.  Id. Plaintiff finally lay down on the mattress on the floor and fell asleep.  Id.

In the early morning hours of May 8, 2014, Inmate V.A. attacked. Plaintiff avers that he awoke to find V.A. stomping on his left ribcage.  Id. Plaintiff was able to get to the emergency call bell before being knocked unconscious.  Id. When he awoke, V.A. was stomping him again; he attempted to shield himself from the blows but was knocked unconscious again. Id. When he regained consciousness, Officer Mullen was present, helped him to his feet and took him to an observation cell, where he lay down on the paper-covered bed and passed out again. Id.

Defendants' version of the events is that none of them ever received a prior complaint or warning from Plaintiff at any time before the May 8, 2014 altercation that Plaintiff felt threatened by being housed with his cellmate. ECF No. 52 at 2. Defendants contend that if Plaintiff had expressed such a fear, the officers on duty would have followed protocol and

referred him to Psychological Services and the Special Investigative Supervisor. Id. Further, the officers on duty would have notified the Lieutenant on duty, and appropriate action would have been taken. Id.  Defendants contend that when the officers arrived at Plaintiff's cell in response to the 3:32 a.m. report of a fight, they observed V.A. "striking Plaintiff in the head and upper torso as he was lying on the cell floor.  Officers ordered both inmates to submit to hand restraints and both inmates complied with the order." Id. Both inmates were medically assessed and photographed after the altercation and the Captain and Duty Officer were notified, in compliance with BOP protocol. Id. Finally, Defendants argue that because they had no prior warning from Plaintiff that he was in danger from his roommate, and they performed their duties according to the law, they are entitled to qualified immunity.  Id. at 8.

Plaintiff's sworn declaration in response reiterates his version of the events; asserts that the Defendants are lying on a number of points; and fails to address Defendants' claim of qualified immunity. ECF No. 56-1 at 1 – 7. Plaintiff contends that Officer Harrison's Declaration falsely states that both inmates submitted to being cuffed after the incident; he argues that he was not cuffed after the incident, because he was unconscious on the floor; was awakened by Officer Mullen and was walked to the observation cell by Mullen and left there. Id. at 5 – 6. He also disputes Harrison's contention that he was photographed after the altercation, stating he was not photographed until May 15, 2014. Id. at 6.  A careful review of Plaintiff's response reveals that it somewhat contradicts his previous version of the events and adds at least one new allegation not previously made. Specifically, Plaintiff now contends that when Officer Brown returned with the Four Unknown BOP Officers in response to V.A.'s continued pushing of the emergency button "they ordered me to cuff up first, wich [sic] I did, thinking I was being moved" [id. at 5], where before, he asserted that the officers specifically warned him that they had to cuff V.A.  first,

because of V.A.'s propensity for attacking cuffed cellmates. See ECF No. 1 at 13. Plaintiff's response also asserts that the reason he was put into a "stripped cell" was because Officer Brown searched his cell and "recovered" two sheets and two blankets, which led to "all things being taken." ECF No. 56-1 at 5.

With regard to qualified immunity, the United States Supreme Court has provided that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992). The analysis of the defense of qualified immunity is examined using a two-step analysis. Saucier v. Katz, 533 U.S. 194 (2001). The first step is to determine whether the facts alleged show that the defendants' conduct violated a constitutional right. Id. at 201. If the facts so viewed do not establish a violation of a constitutional right, the plaintiff cannot prevail, and "there is no necessity for further inquiries concerning qualified immunity." Id. However, if a favorable view of the facts does establish such a violation, the next step is to determine whether the right violated was clearly established at the time of the alleged offense. Id. If the right was not clearly established, the defendants are entitled to qualified immunity. Id.

**1) John Doe I, John Doe II, Lt. Riffle, Officer Brown, Officer Brady, Officer Mullen, and the Four Unknown BOP Officer's alleged failure to protect Plaintiff**

Plaintiff alleges that John Doe I, John Doe II, Lt. Riffle, Officer Brown, Officer Brady, Officer Mullen and the Four Unknown BOP Officers failed to protect him when they refused to respond to his repeated requests to move him from the cell he shared with inmate V.A.  He further contends that when Officer Mullen came on the next shift, he likewise informed Plaintiff that he would not be moved, when Plaintiff repeated his plea to be moved because of inmate

V.A.'s threats.  Finally, Plaintiff contends that the Four Unknown BOP Officers also participated in refusing to protect him when they helped escort him back to the cell he shared with Inmate V.A.

Deliberate indifference on the part of prison officials to a specific known risk of harm states an Eighth Amendment claim. Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987). However, not every injury suffered by an inmate at the hands of other inmates translates into constitutional liability for the prison officials responsible for the Plaintiff's safety. See Farmer v. Brennan, 511 U.S. 825, 835 (1994)(holding that a prison official may be held liable only if he "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."). The test is not whether an official knew or should have known of the possibility of harm, but whether he did in fact know of it and consciously disregarded that risk. "[T]he official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. While the objective information known to the official may be used to infer the knowledge he actually had, and to draw inferences about his actual state of mind, those inferences are not conclusive.

The Defendants provide a sworn Declaration from Lieutenant Alex Harrison averring that in 2014, he was a Lieutenant at USP Hazelton, at that on

> Thursday, May 8, 2014, at approximately 3:32 a.m., the Control Center Officer announced a cell fight in the Special Housing Unit ("SHU").  I responded to the SHU with the Compound Officer.  Upon arrival, I was notified by SHU staff that there was a fight on Range (6), cell 241.
>
> I responded to the cell, and ordered the two inmates to submit to hand restraints, to which they both complied.  When I arrived, I witnessed inmate . . . [V.A.] kicking Plaintiff while he was lying on the cell floor.  I did not observe any serious injuries when I arrived on the scene.

13

Following the altercation, both inmates were medically assessed, photographed, and the Captain and Duty Officer were properly notified in compliance with BOP protocol.

ECF No. 52-6 at 2.

Defendants also provide Christopher Mullen's ("Mullen") sworn Declaration, which avers in pertinent part that:

[t]here was no documentation in place requiring Plaintiff and his cell mate to be separated. Additionally, there was no documentation indicating that Plaintiff s cell mate was a danger based upon prior violent acts. Had Plaintiff told me he was in danger, I would have informed the Lieutenant on duty. I was not under orders "not to help" Plaintiff, nor would I have stated that to an inmate.

ECF No. 52-3 at 3.

Officer John Brady's ("Brady") sworn Declaration denies Petitioner's allegation that he refused to permit him to be moved and specifically denies that he ever told Plaintiff "O [sic] you will go back into the cell with him" and smiled.  ECF 52-4 at 2.  Further, Brady avers that Plaintiff never advised him he felt threatened by his cellmate, and that there was no documentation in place requiring Plaintiff and his cellmate to be separated or any documentation indicating that Plaintiff's cellmate was a danger based upon prior violent acts. Id. Finally, Brown avers that if Plaintiff had reported that he was in danger, he would have informed the Lieutenant, and referred Plaintiff to Psychological Services and the Special Investigative Supervisor. If a threat was present, Plaintiff would have been removed from his cell and placed in another cell. Id.

Officer Brad Brown's sworn Declaration denies that Plaintiff ever told him he felt he was in danger from his cellmate, avers that there was no documentation in place to show that Plaintiff and V.A. were separatees, and avers that if Plaintiff had told him he thought he was in danger from his cellmate, he would have informed the Lieutenant and referred Plaintiff to Psychological

14

Services and the Special Investigative Supervisor. If a threat had been present, Plaintiff would have been removed to a different cell.  Further, he avers that he had no specific recollection of Plaintiff's cellmate ever asking him to make a phone call.  ECF No. 52-5 at 2.

After a careful review of the record, the undersigned finds that this claim, viewed in the light most favorable to the Plaintiff, is sufficient to survive the Defendant's motion for summary judgment.  It gives the Defendant fair notice of his claims and the grounds upon which they rest. The undersigned cannot make a determination on the present record as to whether Plaintiff did in fact repeatedly request to be moved; whether Inmate V.A. did in fact have a known track record for attacking cellmates; or whether Plaintiff had more involvement in the  May,  2014  incident than the parties have admitted.

The record does not establish whether Defendants knew of a substantial risk of serious harm to Plaintiff and consciously disregarded that risk, in violation of Plaintiff's constitutional rights. Many questions remain unanswered. It is unclear from the record why the Plaintiff would have been taken from the cell and disciplined if it were his cellmate who was creating the disturbance. Absent from the Defendants' response, other than a sworn denial that they failed to protect Plaintiff, is any documentation to prove it.

Given the state of the dueling sworn affidavits between the parties and the Defendants' inadequate response, a full record is not before the Court. Both parties have provided radically conflicting sworn declarations as to the facts.  A more fully developed record is necessary – one which includes copies of the Incident Reports that all BOP personnel involved in such an incident would have been required to complete and submit under these circumstances; a list of Plaintiff's and Inmate V.A.'s separatees; a copy of Plaintiff's and V.A.'s disciplinary infraction records; Plaintiff's full and complete medical records to date, to verify whether Plaintiff did in

15

fact sustain rib fractures in the incident, and to determine the present status of his injuries; and a copy of any video surveillance record of the incident, if such exists.

The Defendants provided the Declaration of Alex Harrison, indicating that he arrived at the scene of the fight with the "Compound Officer" who reported the fight and witnessed at least part of the incident, but the Declaration does not say where, on Plaintiff's body, Harrison saw V.A. kick, nor does it identify the Compound Officer was, what he reported seeing, and if any other BOP personnel arrived on the scene with him or attended to either V.A. or Plaintiff afterward, other than P.A. Meyer's Declaration as to medical care provided to Plaintiff.

The record is also silent as to what became of inmate V.A. after the incident; whether he was charged with a violation, and whether Plaintiff was charged with a disciplinary infraction, sufficient to warrant his 11-day stay in punitive segregation. Nor have the Defendants provided a sworn Declaration from all of the other BOP personnel involved in the incident; and a complete report of all charges, if any, to the Plaintiff for a disciplinary violation arising out of the May, 2014 incident.

It is also unclear from the record whether Plaintiff's physical injuries from the May, 2014 altercation were serious.  Defendants aver that they were insignificant, that Plaintiff refused treatment, and never had any evidence of fractures. Plaintiff insists otherwise, claiming that his ribcage was stomped and he sustained rib fractures. What appears likely from the records Plaintiff produced in his FTCA action on the same claims is that Plaintiff may be overstating his physical injuries from the May 2014 incident.  His claim of lumbar and cervical disc problems and spinal cord stenosis is not compatible with his claim that only his ribcage was "stomped." However, evidence of remote rib fractures with rib deformity in the lower left ribs found on a subsequent imaging study could be related. It appears likely from the limited record presently

before the undersigned in this civil action and in Plaintiff's FTCA action, that the greater portion of the Plaintiff's claimed injuries may be either due to congenital factors or the normal aging process.

Defendants aver that the altercation occurred at around 3:32 a.m. and Plaintiff was seen by P.A. Meyer at around 5:30 a.m. Without providing any copies of Plaintiff's medical records to substantiate it, Defendants contend that Plaintiff refused to be examined or treated for his injuries, or even to permit that his vital signs be checked. ECF No. 52 at 2 – 3. Defendants aver that Plaintiff was instructed to follow up at sick call as needed. Id.  at 3. Defendants aver that Plaintiff was first seen by non-defendant Registered Nurse Friend on May 15, 2014. ECF No. 52 at 3. Plaintiff implies that the first time he was seen by any other medical personnel after the altercation was by "Mr. Frind." ECF No. 1 at 15.  Although Plaintiff admits that Nurse "Frind" gave him 10 days of pain medicine and told him he would "put . . . [him] in for x-rays, wich [sic] never happened" [ECF No. 1 at 15], he also contends he was repeatedly refused medical care for his injuries for the duration of his stay at USP Hazelton.  Id.  The Defendants aver that Plaintiff repeatedly received medical care all throughout the remainder of the month of May, 2014 and continuing until he left USP Hazelton in October of that year. ECF No. 52 at 3. Plaintiff's sworn declaration directly contradicts this.  ECF No. 56-1 at 6 – 7.

Significantly, Defendants have not produced a sworn Declaration from "Nurse Friend," who Plaintiff alleges examined him and noted rib fractures, swelling, and severe bruising on May 15, 2014.  Plaintiff also contends that he was not photographed until May 15, 2014; Defendants impliedly assert that he was photographed immediately after the altercation. ECF No. 52-6 at 2.

Because genuine issues of material fact remain on this claim, the Defendants' motion for summary judgement should be denied as to this issue. Discovery may very well demonstrate that

17

the Plaintiff's claims ultimately have no merit and must be dismissed; if so, the defendants may reassert a more appropriately-founded dispositive motion at a later stage of these proceedings.

## B. Physician's Assistant C. Meyer's deliberate indifference to Plaintiff's serious medical needs

Plaintiff's complaint alleges that P.A. Meyer was deliberately indifferent to his serious medical needs in violation of his constitutional rights, because Meyer only gave him a cursory view instead of an actual medical exam and treatment when Defendants first discovered him after the May 8, 2014 assault. Further, Plaintiff alleges that Meyer, as the "gate keeper" between him and the medical doctor, controlled his access to all medical care.  He asserts that Meyer ignored and/or refused his repeated pleas for medical care while he was confined to the SHU in the months after the assault; and refused to let him see a doctor, have pain medicine, or receive x-rays. ECF No. 1 at 5 & 14 – 17.

Specifically, Plaintiff contends that at around 7 a.m. the day of the attack, he was aroused when the paper sheets were pulled off him by the "unknown Lt. or Captin [sic] . . . and P.A. Meyer." Id.  P.A. Meyer walked around the mattress, stated aloud "he has an abrasion over his eye and one on his knee" and then they left. Id. at 15. He contends he was left in the SHU cell in paper clothing and sheets for an unspecified amount of time, before finally being seen on an unspecified date by "someone from Medical." Id.  During that time, he contends was unable to get up to take medications, get food, water, or use the bathroom. Id. When he was seen again at an unspecified date and time by medical personnel, it was "a person named Mr. Frind" who examined him and told him he could see and feel where his rubs were broken and all the swelling and bruising "which was black, blue and yellow." Id. "Mr. Frind" prescribed pain medications for ten days and told Plaintiff he would order x-rays "which never happened." Id.

Plaintiff alleges that he remained in the Special Housing Unit ("SHU") for the duration of his time at USP Hazelton. He alleges that during that time, it was P.A. Meyer who conducted sick call "most of the time." Id. Plaintiff avers that he requested to be seen by a doctor "over 10 times" but all he ever received in response from "P.A. Meyer and others" were directives given through his closed cell door to "buy Ibuprofen." Id. Despite his injuries, he was never examined by a doctor and no x-rays were ever performed; and all his requests for medical care were "ignored for months" until he was transferred away from Hazelton. Id.

Defendants' version of the events is that after staff responded to report of a fight in Plaintiff's SHU cell at around 3:32 am on May 8, 2014, both inmates were medically assessed and photographed and the Captain and Duty Officer were notified, in compliance with BOP protocol. ECF No. 52 at 2. Plaintiff was seen by P.A. Meyers at around 5:33 a.m., but refused to cooperate with Meyer's examination, so Meyers was unable to assess Plaintiff's injuries or vital signs. Id. at 3. However, Meyer made limited visual observations to the effect that Plaintiff appeared well, oriented, and not in distress, and that he had superficial abrasions to his right eyebrow with a 1-2 cm contusion to the right and left forehead and superficial abrasions to both knees. Id. He was instructed to follow up at sick call as needed. Id.; see also Declaration of Christopher Meyer, ECF No. 52-7 at 2 – 3.

Defendants also contend that Plaintiff was subsequently seen by medical staff, a Registered Nurse by the surname "Friend," on May 15, 2014, at which time Plaintiff complained of pain in his center posterior neck and center back, and reported that he was on a hunger strike. ECF No. 52 at 3. Nurse Friend found no redness or tenderness to touch in the areas Plaintiff alleged he had pain; but some yellow bruising on Plaintiff's right forearm, left wrist, and thumb area. Id. The records make no mention of broken bones. Id. Friend consulted with the Clinical

Director, who reviewed Plaintiff's medical records and determined that there was no indication

for x-rays, based on Plaintiff's injuries, complaints and exams.  Id.  Defendants further allege

that Plaintiff was seen on 11 other occasions by health services in May, 2014, and 15 more

occasions between June, 2014 and his transfer from USP Hazelton in October, 2014.  Id.

Defendant P.A. Christopher Meyer's ("Meyer") sworn Declaration on the issue avers in

pertinent part that

> I am currently employed as a Physician's Assistant at the United States
> Penitentiary in Hazelton, West Virginia ("USP Hazelton").  I was commissioned
> in the Public Health Service on August 3, 2012.
>
> I have been informed that inmate Michael Berryman, Federal Register Number
> 64649- 051, alleges in the instant lawsuit that I failed to provide him proper
> medical treatment. Specifically, Plaintiff alleges that I am the "gatekeeper" of
> medical treatment at USP Hazelton, and would not allow him to be seen by
> doctors after an altercation in the SHU on May 8, 2016.
>
> I recall Plaintiff, but I deny his allegations. At no point did I hinder Plaintiff s
> ability to receive medical treatment by staff at USP Hazelton. I have been the
> Physician's Assistant for the SHU for seven years.  It is my job to tend to the
> medical needs of the inmates in the SHU.
>
> I provided care to Plaintiff on May 8, 2014 at approximately 5:33 in the morning.
> Plaintiff was suffering from minor injuries, including a superficial abrasion to his
> right eyebrow with a one to two centimeter contusion to the right and left
> forehead, as well as superficial abrasions to bilateral knees.  I noted these injuries
> in his medical record.   I was unable to examine Plaintiff further as he was
> uncooperative with his examination and refused a direct examination.   He
> similarly refused dressing and wound care.
>
> I have reviewed Plaintiff's medical record, and he was seen on again on May 15,
> 2014, by USP Hazelton Registered Nurse, whom Plaintiff refers to as "Frind." He
> complained of pain, and informed the provider that he was on a hunger strike.
> Plaintiff complained of pain in his center posterior neck, and the center of his
> back.  The provider noted in his record that there was no redness or tenderness to
> the touch when examined.  Additionally, there was some yellowed bruising on his
> right forearm, left wrist, and thumb area. There are no notations of broken bones
> in Plaintiff s medical record from this encounter. The Registered Nurse consulted
> the Clinical Director, who suggested that Plaintiff did not need to be sent for an x-
> ray based upon his injuries and complaints.

I am aware that Plaintiff alleges that he was left in a cell wearing only paper, with no access to hygiene or other items. The decision to remove clothing or personal items from a cell due to behavioral issues is not the decision of Health Services, and therefore I have no knowledge of this allegation.

At all times, Plaintiff was provided with proper medical care by myself and the Health Services staff at USP Hazelton. Plaintiff went on a hunger strike in May of 2014 and was properly cared for and monitored based upon the BOP hunger strike protocol.

Additionally, according to his medical record, Plaintiff received proper medical throughout his time at USP Hazelton. He saw medical staff for a variety of complaints on 28 separate occasions from May 2014 until his transfer in October 2014. Following the incident, medical staff treated Plaintiff on 13 occasions from May 8, 2014 through May 31, 2014.

ECF No. 52-7 at 2 – 3.

Plaintiff's response in opposition reiterates his claims that the only medical examination P.A. Meyer provided to him the morning of the assault was a walk around his bed, a cursory visual exam, and a brief statement to the effect that Plaintiff had "abrasions on his forehead and knee" before walking out of the room. ECF No. 51-6 at 6. Further, Plaintiff reiterates his claim that that every time he tried to obtain help for the pain he was experiencing, P.A. Meyer would respond to his request through his closed cell door, telling him to buy Ibuprofen, and then laugh and walk away. Id. Plaintiff repeats his claim that Meyer was the "gatekeeper for medical," and without his assent, no medical care, medication, exam by other medical personnel, or x-ray would be provided. Id. at 7.  Further, he alleges that if another medical provider, such as "Frind [sic]" suggested a treatment, P.A. Meyer would "stop" it.  Id. He also contends that Meyer was aware that he was "left in paper with no access to hygine [sic] or other items, he saw me with his own eyes and laughed about it," and for the first time averring that Meyer told him "they don't make pills for broken ribs." Id.  Finally, Plaintiff avers that Meyer left him in severe pain for months, refused him any medical help, and that he has suffered with severe neck and back

injuries along with broken ribs, from the assault.  Id. Plaintiff's response in opposition does not address Defendants' claim that Meyer, as Public Health Officer, is immune from prosecution.

Neither Plaintiff nor the Defendants have produced copies of any of Plaintiff's medical records to support their version of events.  However, in the FTCA action Plaintiff filed over these same events, attached both to Plaintiff's complaint and his motion for an outside medical exam are: a partial copy of a January 6, 2015 CT of the chest, abdomen and pelvis without IV contrast [Case No. 1:16cv63, ECF No. 1 at 19]; a partial copy of a March 27, 2015 CT of the cervical spine without contrast [Case No. 1:16cv63, ECF No. 1 at 20]; a copy of a June 7, 2015 MRI of the lumbar spine [Case No. 1:16cv63, ECF No. 1 at 21 – 23]; a partial copy of a May 25, 2016 MRI of the cervical spine without contrast [Case No. 1:16cv63, ECF No. 49-1 at 1]; and a partial copy of a May 25, 2016 MRI of the lumbar spine without contrast.  See Case No. 1:16cv63, ECF No. 49-1 at 4.

The January 6, 2015 CT of the chest, abdomen and pelvis, performed approximately 8 months after the May 8, 2014 assault notes "[e]vidence of remote rib fractures and rib deformity lower anterior left chest. No acute rib fractures."  See Case No. 1:16cv63, ECF No. 1 at 19.

The March 27, 2015 CT of the cervical spine, performed approximately ten months and two and a half weeks after the May 8, 2014 altercation, shows moderate cervical degenerative joint disease; no acute bony abnormality; and possible thecal sac encroachment at C3-C4.  See Case No. 1:16cv63, ECF No. 1 at 20. Not only are these degenerative changes, nowhere has Plaintiff ever alleged that he was struck in the neck.

The MRI of the lumbar spine, performed on June 7, 2015, approximately 11 months after the May, 2014 assault, performed for complaints of low back pain, does show straightening of the normal lumbar lordosis; mild convex left lumbar scoliosis; congenitally short pedicles

causing diffuse baseline central spinal stenosis; minimal central spinal stenosis at L2-L3; mid-central spinal stenosis at L3-L4; small central disc protrusion, severe spinal stenosis, moderate bilateral lateral recess stenosis; moderate bilateral neural foraminal narrowing at L4-L5; numerous traversing nerve roots are potentially compressed, and a small right paracentral disc protrusion at L5-S1 contacts the traversing right S1 nerve roots; prominent epidural fat at the same level completely effaces the thecal sac.  See Case No. 1:16cv63, ECF No. 49-1 at 6.  However, not only do the detailed findings of this exam document multiple signs of chronic arthritic changes which take many years to develop, as opposed to acute injuries, the reference to "congenitally short pedicles" indicates that the root cause of Plaintiff's "diffuse baseline central spinal stenosis" is something he was born with, nowhere in his complaint does Plaintiff ever allege that he sustained any injury to his lumbar spine (lower back).

The May 25, 2016 MRI of the cervical spine, performed two years and 2+ weeks after the May, 2014 altercation, shows no apparent masses, tonsillar herniation or narrowing of the foramen magnum at the craniocervical junction (junction between head and neck); no evidence of subluxation of the vertebral column; some "chronic-appearing invagination involving the superior endplate C7 vertebral body, but the radiologist noted that "[t]his area is not associated with bone marrow edema to suggest acute compression fracture deformity." The exam also revealed that Plaintiff's cervical spinal cord at the C2-C3 level had no evidence of disc herniation, central spinal stenosis or significant foraminal stenosis. At the C3-C4 level, there was moderate central disc osteophyte, resulting in ventral compression of the thecal sac ad abutting the adjacent cervical spinal cord, with mild flattening, causing mild narrowing of the anterior/posterior dimensions of the cervical spinal

canal, and facet joint degenerative changes resulting in mild narrowing of the left foramen. At the C4-C5 level, there was a mild bulging disc without evidence of disc herniation or central spinal stenosis, but some mild-moderate narrowing of the left foramen, due to degenerative changes. See Case No. 1:16cv63, ECF No. 49-1 at 2. Not only are osteophytes and degenerative changes of the spinal cord a result of years of accumulated osteoarthritis, a part of the normal aging process, nowhere in his complaint does Plaintiff ever allege he was injured in the neck (cervical spine).

The May 25, 2016 MRI of the lumbar spine, also performed two years and 2+ weeks after the May, 2014 altercation, shows no enlargement, masses or signal abnormality in Plaintiff's conus medullaris; no evidence of compression fracture deformity or subluxation in the vertebral column; no evidence of disc herniation at L1-L2; age-related degenerative changes of the disc manifested by dessication of disc material at the L2-L3 level without evidence of disc herniation, central spinal stenosis or significant foraminal stenosis, and some mild facet joint degenerative changes;  and a mild bulging disc at the L3-L4 level with mild narrowing involving the inferior aspect of the neural foramen, but with no evidence of encroachment on the nerves exiting from that location, and mild facet joint degenerative changes with no evidence of significant central spinal stenosis. See Case No. 1:16cv63, ECF No. 49-1 at 4. Again, the changes seen appear to be age-related osteoarthritic changes of the lumber spine (lower back), and area where Plaintiff has not alleged he was struck.

Title 42 U.S.C. § 233(a) makes the FTCA the exclusive remedy for specified actions against members of the Public Health Service ("PHS"). In particular, it protects commissioned officers or employees of the PHS from liability for "personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions" by requiring that such

lawsuits be brought against the United States instead. The United States thus, in effect, insures designated public health officials by standing in their place financially when they are sued for the performance of their medical duties. Cuoco v. Moritsugu, 222 F.3d 99, 109 (2nd Cir. 2000). See also, US v. Smith, 499 U.S. 160, 170  n.11 (1990) (42 U.S.C. § 233 is one of several statutes passed to provide absolute immunity from suit for Government medical personnel for alleged malpractice committed within the scope of employment); Carlson v. Green, 446 U.S. 14, 20 (1980) (Congress explicitly provides in 42 U.S.C.§ 223(a) that the FTCA is a plaintiff's sole remedy against PHS employees); Apple v. Jewish Hospital and Medical Center, 570 F. Supp. 1320 (E.D.N.Y. 1983)(Motion for dismissal of the action against the defendant doctor, a member of the National Health Corps, granted, and the United States substituted as defendant, and case deemed a tort action). Therefore, pursuant to 42 U.S.C. § 233(a), Congress made proceedings under the FTCA the sole avenue to seek relief against any PHS employee for injuries resulting from the employee's performance of medical functions within the scope of his or her employment.  The Supreme Court confirmed this rule in Hui v. Castaneda, by specifically holding that the immunity provided by §233(a) precludes a Bivens action against individual PHS officers or employees for harms  arising  out  of  constitutional violations committed while acting within the scope of their  office or employment.  Hui, 559 U.S. 799, 802 (2010).

It is apparent from the record that Plaintiff had only been at USP Hazelton for at most, a few days before the May, 2014 altercation occurred. See Declaration of Howard Williams, Legal Assistant, Mid-Atlantic Regional Office, ECF 52-1, ¶4 at 2. Had the Defendants only produced a copy of Plaintiff's BOP medical records, the undersigned could have easily determined whether the "remote" rib fractures seen on the Plaintiff's January 6, 2015 CT of the chest, abdomen and pelvis were perhaps already documented as a pre-existing condition by the BOP during his initial

medical examination upon arrival. "Remote" is an inexact description; it merely means that the fractures were not "acute," or fresh. This exam was performed eight months after the May, 2014 altercation, when any rib fracture would be expected to have long since healed, given that rib fractures typically take one to two months to heal. As noted *supra,* a genuine issue of material fact exists, then, as to whether the May 8, 2014 altercation caused the rib fractures. Nonetheless, because Defendant P.A. Meyer is a Physician's Assistant who has been a commissioned officer in the Public Health Service since August 3, 2012 [ECF No. 52 at 13; see also ECF No. 52-7 at 2], pursuant to 42 U.S.C. § 233(a), he is entitled to absolute immunity from suit in this Bivens action for all claims arising from the medical care he provided to Plaintiff, and he should be dismissed from Plaintiff's lawsuit.  Moreover, because Plaintiff has not implicated any other Defendant in his claim for deliberate indifference to his serious medical needs, this claim must be dismissed in its entirety.

### C. Due Process violation by Officers Brown and Brady, Lt. Riffle, and Four Unknown Officers, for being confined in punitive segregation without cause

A Bivens action is used to hold federal officers "individually liable for constitutional violations." Starr v. Baca, 625 F.3d 1202 (9th Cir. 2011). Even more generally, a Bivens action allows individuals to sue a federal actor because he or she violated a right guaranteed by the Constitution or a federal law. See Bivens, 403 U.S. at 392-94. Further, "[a]lthough 'more limited in some respects,' a Bivens action is the federal analog to an action against state or local officials under § 1983." Id. (quoting Hartman v. Moore, 547 U.S. 250, 254 n.2 (2006)).  Liability under §1983 is "personal, based upon each defendant's own constitutional violations."[2] Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001) (internal citation omitted). Therefore, in order to establish liability under §1983, the plaintiff must specify the acts taken by each defendant which

---

[2] In making this inquiry, case law under 42 U.S.C. §1983 is applicable to Bivens actions. See Butz v. Economou, 438 U.S. 478, 504 (1978).

violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2nd Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3rd Cir. 1988).   Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainwright, 802 F.2d, 401 (11th Cir. 1986).

The Due Process Clause of the Fifth Amendment provide that no person shall be "deprived of life, liberty, or property, without due process of law." Before it can be determined that the due process clause was violated, it must be determined that a liberty interest was at stake. Sandin v. Connor, 515 U.S. 472 (1995).

Here, Plaintiff alleges that after his cellmate V.A. attacked him on May 8, 2014, Officer Brown, Lt. Riffle, and Four Unknown BOP Officers "took all property from me, placeing [sic] [me] into paper clothing without anything for 11 days and did not intitle [sic] me to a due process hearing before subjecting me to the atypical and significant hardship of this punitive segregation." ECF No. 1 at 16. Plaintiff also contends that Officer Brown "cause[d] the deprivation of my basic human needs without my Due Process." Id. at 3. Further, he alleges that Officer Brady "played a part in striping [sic] me of all my lifes [sic] basic human needs without any of my Due Process rights being given to me." Id. at 4. Thus, the injury Plaintiff appears to allege is that he was confined for 11 days in the SHU without his own clothing, bedding, hygiene products, and without access to his personal belongings including legal paperwork.

Very liberally construed, it appears that Plaintiff is alleging that he did not meet the standard for admission to the SHU and that he was placed there without a hearing. Plaintiff's complaint provides no further argument in support of this claim; his response to the Defendants' dispositive motion is similarly devoid of any mention of a due process violation caused by unjustified placement in the SHU, other than to declare that each time he asked P.A. Meyers for

medical help, Meyers would tell him through his closed door "*you got into a fight* now you want

me to help you, buy I.B.U. from the store[.]" ECF No. 56-1 at 6 (emphasis added). Defendants'

memorandum in support of its dispositive motion completely fails to address this issue. Of note,

however, Defendants' memorandum in support also appears to characterize the attack by

Plaintiff's cellmate as a "fight:"

> On Thursday, May 8, 2014, at approximately 3:32 a.m., the Control Center
> Officer announced a fight in the Special Housing Unit. Officers responded, and
> SHU staff notified them that **there was a fight on Range (6), cell 241**. . . When
> officers arrived, they observed inmate . . . [V.A.] . . .  striking Plaintiff in the head
> and upper torso as he was lying on the cell floor. Officers ordered both inmates to
> submit to hand restraints and both inmates complied with the order. . . Following
> the altercation, both inmates were medically assessed, photographed, and the
> Captain and Duty Officer were properly notified in compliance with BOP
> protocol . . .

ECF No. ECF No. 52 at 2 (emphasis added).

A careful review of the Plaintiff's FTCA complaint on the same set of facts alleged here

lends credence to the suggestion that Plaintiff was in fact charged with some sort of violation

arising out of the May, 2014 altercation, but was later exonerated; he contends there that his

"[p]rocedural due process was [sic] violated" when "the Institution violation that was served on

me after the deprivation of lifes [sic] basic human needs . . . was later expunged from my file

because they found my  due process was violated." See Case 1:16cv63, ECF No. 1 at 10. Aside

from impliedly alleging that he did not meet the criteria for placement in the SHU, and admitting

that at least one Defendant (Meyer) contended he had been fighting, and that he was placed in

the SHU without a hearing, Plaintiff's complaint provides no further information which would

indicate that his due process rights were denied. Defendants' dispositive motion omits any

mention of this claim.

28

Nonetheless, even assuming that a false disciplinary report was filed against Plaintiff, contrary to Plaintiff's belief, he does not have a constitutional right to be free from false disciplinary reports, even if one was filed against him. See Richardson v. Smith, No. 2:14-cv-64, 2015 WL 9875842, *10, Aloi, M.J.  (N.D. W.Va. Nov. 2, 2015) ("In addition, plaintiff does not have a constitutional right to be free from false disciplinary reports.") *adopted by* Richardson v. Smith, 2016 WL 237125, Bailey, J. (N.D. W.Va. Jan. 20, 2016). "The act of filing false disciplinary charges does not itself violate a prisoner's constitutional rights." Lewis v. Viton, 07-3663, 2007 WL 2362587 * 9 (D.N.J. Aug. 14, 2007) (citing Freeman v. Rideout, 808 F.2d 949, 962-53 (2nd Cir. 1986)). There is simply no constitutional right to be free from being falsely accused. See McClary v. Fowlkes, 1:07cv1080 (LO/TCB), 2008 WL 3992637 *4 n.6 (E.D. Va. Aug. 27, 2008) ("To the extent that plaintiff claims that he was falsely accused, he fails to state a § 1983 claim because '[t]he prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.'") (internal citations omitted); Anderson v. Green, 2009 WL 2711885*4, Civil Action No. AMD-08-2708 (D. Md. Aug. 24, 2009) (same); Riggleman v. Ziegler, No. 5:11-cv-0868, 2012 WL 4119674 * 5, Van Dervort, M.J. (S.D. W. Va. Aug. 22, 2012) (inmates have no constitutional right prohibiting false charges against them).  Accordingly, this claim must be dismissed.

## D. Conditions of Confinement claims against Lt. Riffle, Officer Brown, Officer Brady, and Four Unknown BOP Officers

In general, the Eighth Amendment prohibits "cruel and unusual punishment." Farmer v. Brennan, 511 U.S. 825 (1994). In order to comply with the Eighth Amendment, prison punishment must comport with "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102 (1976). "A  prison official cannot be

found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety;  the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. at 837.

It must be remembered that "the Constitution does not mandate comfortable prisons" and prisons "cannot be free of discomfort." Rhodes v. Chapman, 452 U.S. 337, 349 (1981). Therefore, a deprivation of a basic human need is "only those deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298 (1991).

To act with a "sufficiently culpable state of mind," a prison official must not only know of the facts leading to the deprivation, but also know that deprivation would expose an inmate to a certain danger. See Oliver v. Powell, 250 F. Supp. 2d 593, 604 (E.D. Va. 2002); See also, DeBlasio v. Johnson, 128 F. Supp. 2d 315, 325 (E.D. Va. 2000). A constitutional violation can be shown if a prison official shows deliberate indifference to the inmate's health or safety. Farmer v. Brennan, *supra* at 828.

Conditions of confinement for those who have been convicted of crimes are evaluated under the Eighth Amendment.  The United States Supreme Court set forth the general framework under which such claims are to be decided in  Rhodes v. Chapman, 452 U.S. 337 (1981). "Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment."  Id. at 347. Accordingly, under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 753 F.2d 118,

125 (2nd Cir. 1978), *rev'd on other grounds*, Bell v. Wolfish, 441 U.S. 520 (1994) (Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"), *quoting* Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).

Here, Plaintiff contends that during his 11-day confinement in the SHU at USP Hazelton, Lt. Riffle, Officer Brown, Officer Brady, and Four Unknown BOP Officers all participated in the denial of his access to regular clothing, regular bedding, and his personal belongings, including legal materials and hygiene products. ECF No. 1 at 14 & 16.

Defendants argue that Plaintiff fails to identify which Defendant violated his Eighth Amendment rights by placing him in paper clothing; failed to allege that any Defendant did so with a sufficiently culpable state of mind; or that he suffered any injury as a result. Further, they aver that there is no evidence to show that Plaintiff was placed in a cell without his basic necessities.  ECF No. 52 at 11 - 12.  Although they stop short of alleging that Plaintiff ever did so, they argue that inmates "are generally placed in alternative clothing if they have destroyed their institutional clothing." Id. at 12.  Plaintiff's response in opposition reiterates his claim that he spent 11 days in paper clothing without his belongings, a "complete[e] strip cell." ECF No. 51-6 at 3, 5, & 7.  For the first time, he implies that it was Officer Brown who confiscated his belongings, stating "[o]n May 7, 2014, Officer Brown . . . conducted a search of Plaintiff's cell and stated he "recovered" to sheet[s] and two blanks [sic], wich [sic] lead to all things [being] taken from the cell." Id. at 5.

A liberal reading of the Plaintiff's complaint indicates that he is alleging that his involuntary confinement in the SHU violated his Eight Amendment right to be free of cruel and unusual punishment as well as his right to due process. However, the record establishes

otherwise. Not only has Plaintiff failed to allege any harm as a result of these deprivations, these claims hardly rise to the level of an Eighth Amendment violation. See Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997)(holding that administrative segregation for six months with vermin, human waste, flooded toilet, unbearable heat, cold food, dirty clothing, no outside recreation, and no education was not so atypical as to impose a significant hardship).

Because Plaintiff fails to state a claim for an Eighth Amendment violation regarding his conditions of confinement claims, they should be dismissed.

## E. Officer John Doe I and II, and Four Unknown B.O.P. Officers

As Plaintiff has been previously advised, a plaintiff may name "John Doe" as a defendant when the identity of a defendant is unknown.  Boyd v. Gullet, 64 F.R.D. 169 (D. Md. 1974). However, a district court is not required "to wait indefinitely" for the plaintiff to provide the defendant's true identity to the Court.  Glaros v. Perse, 628 F.2d 679, 685 (1st Cir. 1980).

Plaintiff initiated this action on March 23, 2016.  On September 28, 2016, summonses were issued for the named defendants and Plaintiff was directed to provide identifying information for defendant Dr. John Doe within thirty days. He was given an additional thirty-day extension of time on October 31, 2016, and a further sixty-day extension on November 15, 2016. Plaintiff did not provide the information then and has made no attempt to provide it since. Accordingly, service could not be effectuated on Officer John Doe I or II, or on the Four Unkown BOP Officers.

It has been one year and nearly two months since Plaintiff filed his complaint. Federal Rule of Civil Procedure 4(c) indicates that "[a] summons must be served together with a copy of the complaint." The time frame within which service must be effected is articulated in Rule 4(m), which provides that if service of the summons and complaint is not made upon a defendant

within 90 days after the filing of the complaint, "the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant[.]"  But if the plaintiff shows good cause for the failure, "the court must extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m); see also, Bush v. City of Zeeland, 74 Fed. Appx. 581, 2003 WL 22097837 at *2 (6th Cir. 2003)(citations omitted).

Here, Plaintiff has had more than sufficient time to provide correct information in order to effectuate service on these defendants. Noting Plaintiff's lack of diligence in doing so, the undersigned recommends that the Plaintiff's claims against the John Doe I & II Defendants and the Four Unknown B.O.P. Officers be dismissed for failure to timely effectuate service.

## V. Recommendation

In consideration of the foregoing, it is the undersigned's recommendation that the Defendant's Motion to Dismiss or in the Alternative, Motion for Summary Judgment [ECF No. 51] be **DENIED** in part as to Defendants Lt. Riffle, Officer Brady, Officer Brown, and Officer Mullen only as to Plaintiff's failure to protect claims. Further, the undersigned recommends that Defendant's Motion to Dismiss or in the Alternative, Motion for Summary Judgment be **GRANTED in part** as to Plaintiff's due process claims against Defendants Brown, Brady and Riffle; **GRANTED in part** as to all Defendants, as to Plaintiff's conditions of confinement claims; **GRANTED in part** as to Defendant Meyer and Plaintiff's entire claim of deliberate indifference to serious medical needs; and **GRANTED** in part as to all claims against the John Doe I & II Defendants and the Four Unknown BOP Officers, and that the John Doe I & II Defendants and the  Four Unknown BOP Officers be **DISMISSED** from this action, and that a scheduling Order be entered.

33

Further, the undersigned recommends that Plaintiff's pending Motion to Dismiss or Stay the Defendants' Motion to Dismiss or for Summary Judgment [ECF No. 56] be **GRANTED in part** as to Defendants Lt. Riffle, Officer Brady, Officer Brown, and Officer Mullen and **DENIED in part** as to Defendant Meyer, the John Doe I & II Defendants and the Four Unknown BOP Officers.

The Clerk of Court is **DIRECTED** to correct the names of the Defendants on the docket from "Officer Mullen" to Officer Christopher Mullen; from "Lt. Riffle" to "Lt. Jerald Riffle;" from "Officer Brown" to "Officer Brad Brown;" from "Officer Brady" to "Officer John Brady;" and from "P.A. C. Meyer, Physician's Assistant" to "P.A. Christopher Meyer, Physician's Assistant."

**Within fourteen (14) days after being served with a copy of the Report and Recommendation**, any party may file with the Clerk of the Court written objections identifying the portions of the recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, at his last known address as reflected on the docket. In addition, the Clerk shall transmit a copy electronically to all counsel

of record as provided in the Administrative Procedures for Electronic Case Filing in the United

States District Court for the Northern District of West Virginia.

DATED: May 15, 2017

/s/   James E. Seibert_____
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE