## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**MICHAEL BERRYMAN,**

**Plaintiff,**

**v.**                                                    **Civil Action No. 1:16cv47**
                                                        **(Judge Keeley)**

**OFFICER CHRISTOPHER MULLEN;**
**LT. JERALD RIFFLE; OFFICER BRAD**
**BROWN; and OFFICER JOHN BRADY,**

**Defendants.**

## REPORT AND RECOMMENDATION

### I. Procedural History

On March 23, 2016, the *pro se* Plaintiff, then an inmate at FCI Fairton in Fairton, New Jersey,[1] initiated this case by filing a Bivens[2] civil rights complaint against the above-named Defendants. ECF No. 1. Along with his complaint, he filed a motion to proceed as a pauper with supporting documents. ECF Nos. 2, 3, 4. Pursuant to a Notice of Deficient Pleading, on April 4, 2016, Plaintiff filed a copy of his Prisoner Trust Account Report. ECF No. 8. On June 23, 2016, Plaintiff filed a request for jury demand. ECF No. 12. By Order entered July 20, 2016, Plaintiff was granted permission to proceed as a pauper and directed to pay an initial partial filing fee ("IPFF"). ECF No. 14. Plaintiff paid the IPFF on August 8, 2016 [ECF No. 17] but then on August 18, 2016, moved for an extension of time in which to pay it; the motion was denied as moot on August 22, 2016. ECF Nos. 19, 20.

---

[1] Plaintiff is now incarcerated at FCI Victorville, in Adelanto, California. See ECF No. 166.

[2] Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

On September 28, 2016, Magistrate Judge James E. Seibert conducted a preliminary review of the complaint; determined that summary dismissal was not warranted at that time; and directed the Defendants to answer the complaint; Plaintiff was given an additional thirty days in which to identify the John Doe defendants; and the Clerk was directed to issue 60-day summonses and forward copies of the complaint to the United States Marshal Service to effect service of process upon the remaining named defendants. ECF No. 22.

On October 26, 2016, by separate motions, Plaintiff moved for an extension of time in which to identify the John Doe defendants and to compel discovery. ECF Nos. 28, 29.  By separate Orders entered October 31, 2016, Plaintiff's motion to compel discovery was denied as premature and his motion to extend the time in which to identify the John Doe defendants was granted. ECF Nos. 30, 31. On November 3, 2016, Plaintiff filed a motion/request for the court to review his new information and for appointed counsel. ECF No. 32.  By Order entered November 8, 2016, Plaintiff's motion for appointed counsel was denied. ECF No. 34. On November 14, 2016, Plaintiff moved to temporarily waive service of the complaint and summonses on the John Doe defendants.  ECF No. 35.  By Order entered November 15, 2016, Plaintiff's motion to temporarily waive service of the complaint and summonses on the John Doe defendants was construed as a second motion for an extension of time in which to identify the John Doe defendants and granted.  ECF No. 36.  On November 22, 2016, the Defendants moved for an extension of time and consolidated response date; by Order entered the following day, the motion was granted.  ECF Nos. 40, 41.  On January 18, 2017, the Defendants moved for another extension of time and consolidated response date; by order entered January 24, 2017, the motion was granted. ECF Nos. 48, 49.

On February 22, 2017, the defendants filed a Motion to Dismiss or in the Alternative, Motion for Summary Judgment, with a memorandum in support. ECF Nos. 51, 52.  Because Plaintiff was proceeding *pro se*, a <u>Roseboro</u> Notice was issued on March 1, 2017.  ECF No. 53. On March 27, 2017, Plaintiff filed his response, styled as a Motion to Dismiss or Motion to Stay the Defendant's Motion to Dismiss or for Summary Judgment, attaching a sworn declaration. ECF Nos. 56, 56-1. The motion was also docketed as a second motion for discovery. ECF No. 57.  By Order entered April 24, 2017, the second motion for discovery was also denied as premature.  ECF No. 58.

On May 15, 2017, a Report and Recommendation ("R&R") entered by Magistrate Judge James E. Seibert recommended that the Defendants' Motion to Dismiss or in the Alternative, Motion for Summary Judgment be denied in part as to Defendants Lt. Riffle, Officer Brady, Officer Brown, and Officer Mullen only as to Plaintiff's failure to protect claims, and that  that Defendants' Motion to Dismiss or in the Alternative, Motion for Summary Judgment be granted in part as to Plaintiff's due process claims against Defendants Brown, Brady and Riffle; granted in part as to all Defendants as to Plaintiff's conditions of confinement claims; granted in part as to Defendant Meyer and Plaintiff's entire claim of deliberate indifference to serious medical needs; and granted in part as to all claims against the John Doe I and II Defendants and the Four Unknown BOP Officers; that the John Doe I and II Defendants and the  Four Unknown BOP Officers be dismissed from this action; and that a scheduling Order be entered.  ECF No. 60. Further, the R&R recommended that Plaintiff's pending Motion to Dismiss or Stay the Defendants' Motion to Dismiss or for Summary Judgment be granted in part as to Defendants Lt. Riffle, Officer Brady, Officer Brown, and Officer Mullen, and denied in part as to Defendant

Meyer, the John Doe I and II Defendants, and the Four Unknown BOP Officers; and the Clerk was directed to correct the names of certain defendants on the docket. Id.

On June 2, 2017, Plaintiff moved for an extension of time in which to file objections. ECF No. 62. By Order entered June 6, 2017, the motion for an extension was granted. ECF No. 63.   On June 23, 2017, Plaintiff moved for appointment of counsel. ECF No. 65. By Order entered June 26, 2017, Plaintiff's motion for appointment of counsel was denied. ECF No. 66. On June 30, 2017, Plaintiff filed his objections to the R&R. ECF No. 67. On August 15, 2017, the Defendants Brady, Brown, Mullen, and Riffle filed a Motion to Dismiss Pursuant to 28 U.S.C. § 2676 (the "judgment bar") with a memorandum in support.  ECF Nos. 69, 70.

By Memorandum Opinion and Order entered on August 17, 2017, the R&R was adopted and a Roseboro Notice was issued to Plaintiff, directing him to respond to Defendants Brady, Brown, Mullen, and Riffle's Motion to Dismiss Pursuant to 28 U.S.C. § 2676 (the "judgment bar").  On September 14, 2017, Plaintiff moved for an extension of time. ECF No. 73.

By Order entered September 15, 2017, the instant case was reassigned from Magistrate Judge James E. Seibert to the undersigned. By Order entered September 29, 2017, Plaintiff's motion for an extension of time was granted. ECF No. 74. Plaintiff filed his response in opposition to Defendants John Brady, Brad Brown, Christopher Mullen, and Jerald Riffle's Motion to Dismiss Pursuant to 28 U.S.C. § 2676 (the "judgment bar") on October 18, 2017. ECF No. 76. Defendants Brady, Brown, Mullen, and Riffle filed a reply on October 31, 2017. ECF No. 77.  On December 15, 2017, Plaintiff filed another motion for appointed counsel. ECF No. 78.  By Memorandum Opinion and Order entered on March 9, 2018, Defendants Brady,  Brown, Mullen, and Riffle's Motion to Dismiss Pursuant to 28 U.S.C. § 2676 (the "judgment bar") was

denied; the case was recommitted to the undersigned, and the undersigned was to enter a scheduling order. ECF No. 80.

On March 22, 2018, Plaintiff filed another motion for appointed counsel. ECF No. 83. On March 23, 2018, Defendants Riffle, Brown, Brady, and Mullen each filed Answers to the complaint.  ECF Nos. 84, 85, 86, 87.  By Order entered March 26, 2018, Plaintiff's third and fourth motions for appointed counsel were denied. ECF No. 88. By separate Orders entered April 5, 2018, mediation in this case was referred to Magistrate Judge Robert W. Trumble and a scheduling Order was entered.  ECF No. 90, 91.  On May 4, 2018, Plaintiff moved for an extension of time in which to disclose experts. ECF No. 95.  By separate Orders entered May 7, 2018, Plaintiff's motion for the extension of time was granted in part and an Amended Scheduling Order was entered. ECF Nos. 96, 97.  On June 8, 2018, Plaintiff moved again for appointed counsel. ECF No. 99.  By Order entered June 20, 2018, Plaintiff's fifth motion for appointed counsel was denied. ECF No. 100.  On July 9, 2018, Plaintiff filed his first request for production of documents; a motion to appeal the denial of the Order denying his fifth motion for appointed counsel; and a motion to appeal the order denying counsel to the District Judge.[3] ECF No. 104, 105, 116.

On July 31, 2018, the defendants moved for leave to depose Plaintiff.  ECF No. 120. By Order entered August 2, 2018, Defendants' motion for leave to depose Plaintiff was granted. ECF No. 120. By Order entered by the Fourth Circuit Court of Appeals on August 7, 2018, Plaintiff's interlocutory appeal of the order denying his fifth motion for appointed counsel was closed administratively. ECF No. 126, 127. By Order entered by the District Judge on August 9,

---

[3] The motion to appeal the denial of the Order denying Plaintiff's most recent motion for appointed counsel was first inadvertently docketed as an interlocutory appeal to the Fourth Circuit Court of Appeals and transmitted to the same. See ECF No. 106. It was later re-docketed as an appeal of the undersigned's order to the District Judge. See ECF No. 115.

2018, the undersigned's order denying Plaintiff's fifth motion for appointed counsel was affirmed. ECF No. 128. On August 15, 2018, Plaintiff filed a demand for a jury trial. ECF No. 131. By separate Orders entered August 16, 2018, mediation was scheduled for September 10, 2018; an Order issuing writ of habeas corpus *ad testificandum* was entered; and a writ of habeas corpus *ad testificandum* was issued. ECF No. 133.

On August 23, 2018, the Defendants filed a "Motion to Dismiss for Failure to Prosecute, or, Alternatively, Motion to Cancel or Stay Mediation Because, Among Other Things, Plaintiff Refused to Travel with the United States Marshals Service in Compliance with a Writ Issued by This Court Requiring Berryman to Attend Mediation." ECF No. 138. By Order entered August 29, 2018, the motion was construed as a motion to cancel or stay the mediation and denied [ECF No. 139; Defendants filed a Motion for Reconsideration the same day. ECF No. 140. By Order entered August 31, 2018, Defendants' Motion for Reconsideration was denied. ECF No. 141. On September 4, 2018, Defendants filed an "Objection Asking the District Judge to Cancel or Stay Mediation because Mediation is Futile in this Case and General Notice that Plaintiff Failed to Timely Make a Settlement Demand as Ordered by the Court." ECF No. 142. By Order entered September 6, 2018, the Defendants' objection was overruled and their request to cancel or stay mediation was denied. ECF No. 143. On September 7, 2018, Plaintiff filed a Motion to Dismiss Defendants' Motion to Dismiss for Failure to Prosecute, or, Cancel or Stay the Mediation. ECF No. 146. The same day, Defendants filed a "Notice that Plaintiff Never Made a Settlement Demand as Ordered by this Court, and Therefore, the Defendants Cannot Respond to a Settlement Demand that was Never Presented." ECF No. 148. By Order entered September 10, 2018, Plaintiff's Motion to Dismiss Defendants' Motion to Dismiss for Failure to Prosecute, or, Cancel or Stay the Mediation was denied as moot. ECF No. 149. The mediation took place on

6

September 10, 2018; on September 11, 2018, the Report of the Mediator was filed.  ECF No. 150.  On September 21, 2018, the Defendants filed a Motion for Summary Judgment with a memorandum in support, attaching multiple exhibits, including excerpts from Plaintiff's deposition, declarations from several non-parties, and supplemental declarations from the Defendants.  ECF Nos. 155, 156.  Because Plaintiff was proceeding *pro se*, on September 24, 2018, another Roseboro Notice issued, advising him of his right to respond to Defendants' dispositive motion.  ECF No. 158.  On October 12, 2018, Plaintiff moved for an extension of time to respond; by Order entered October 15, 2018, Plaintiff's motion for an extension of time was granted in part.  ECF Nos. 160, 161. On October 19, 2018, Plaintiff filed his response in opposition. ECF No. 163.  By Order entered October 31, 2018, the Defendants were directed to produce a complete copy of Plaintiff's deposition transcript. ECF No. 164. On November 1, 2018, Defendants filed a "Notice of Compliance with Order Directing Defendants to Provide the Court with Electronic Deposition Transcript" and complete copy of the deposition transcript. ECF No. 165-1. On November 5, 2018, Plaintiff filed a Notice of Change of Address. ECF No. 166.  On November 13, 2018, Plaintiff filed a Notice regarding delay in receiving his legal property from his prior institution. ECF No. 168.

## II. Contentions of the Parties

### A. The Complaint

In the sole remaining claim in Plaintiff's verified complaint, the undersigned considers Plaintiff's allegation that the Defendants failed to protect him from May 8, 2014 assault in the Special Housing Unit ("SHU") at USP Hazelton,  by inmate referred to herein as V.A.

Plaintiff contends that prior to the assault, V.A. had a known history of attacking cellmates and that that in the days preceding the attack, he repeatedly advised the Defendants of

V.A.'s stated threats to attack or kill Plaintiff if Plaintiff was not removed from the cell they shared, but the Defendants refused to move him. ECF No. 1 at 11.  He alleges that he awoke in the early morning hours of May 8, 2014 to find V.A. stomping on his left ribcage.  Id. at 14. Plaintiff was able to get to the emergency call bell to notify staff before being knocked unconscious.  Id. When he awoke, V.A. was stomping him again; he attempted to shield himself from the blows but was knocked unconscious again.  Id. When he regained consciousness, Officer Mullen was present, helped him to his feet and took him to an observation cell, where he lay down and passed out again. Id.

Plaintiff avers that as a result of the attack by V.A., he now has 4 protruding disks in his lower lumbar back area with severe stenosis; lower lumbar thecal sac encroachments; a lumbar slipped disk; cervical spine stenosis from C6-C7; disk herniation moderately encroaching upon the thecal sac at the C3-4 level; "hard disks/osteophyt [sic] complex thecal sac encroaching" C6-7; and evidence of remote rib fractures with rib deformity in the lower left ribs. Id. at 17.

As relief, Plaintiff requests Three Million Dollars ($3,000,000.00) in compensatory and punitive damages; attorney's fees and costs, and injunctive relief in the form of a  declaration that the Defendants' acts and omissions violated his constitutional rights. Id.

## B. Defendants' Motion for Summary Judgment

Defendants contend that summary judgment should be granted in their favor because Plaintiff has not presented sufficient evidence to support a genuine material factual dispute and has not proven the essential elements of his claim. More specifically, they assert that

1) contrary to Plaintiff's claims, at the time of the May 8, 2014 assault, inmate V.A.'s disciplinary records show that V.A. had only been disciplined once for assaulting another prisoner, not three times [ECF No. 156 at 6];

2) Plaintiff never reported his alleged fear of attack from inmate V.A. to any of them before the assault [id. at 9];

3) Plaintiff's claim that he talked to Defendant Brady on May 7, 2014 about removing him from the cell he shared with V.A. has no support in the record, given that Defendant Brady was not on duty that day [id. at 6];

4) Plaintiff's deposition testimony implying that he had conversations directly or indirectly with Lt. Riffle on May 4 or May 5, 2014 about removing him from the cell with V.A. has no support in the record, given that Defendant Riffle was not on duty either day [id. at 7];

5) Prior to the May 8, 2014 incident, Plaintiff and V.A. did not have "keep-away" orders in place, designating them as "separatees." Id. at 5, 8 - 9.

6) The May 8, 2014 attack lasted only four minutes from the time that Berryman rang the duress alarm in his cell before staff responded, stopped the altercation, extracted the inmates, moved them to different cells, and took photos, a length of time inconsistent with Plaintiff's description of a protracted beating during which he repeatedly lost and regained consciousness. Id. at 9.

7) Plaintiff has a reputation for untruthfulness and manipulative behavior, including hunger strikes and suicidal gestures, which he regularly uses, and admits to using, to manipulate BOP staff to get his own way regarding medical care, cell assignments and/or cellmates, or to avoid living in general population, and/or interacting with inmates or groups he dislikes [id. at 1, 3 - 4];

8) Contrary to Plaintiff's claims that he never had any problems with his back prior to the May 8, 2014 altercation with inmate "V.A.," Plaintiff's medical records show that he had an extensive history of pre-existing back injuries before ever coming into BOP custody, including a fractured spine from riding a bull; and multiple other fractures from various events, including being run over by a car, and being shot and/or stabbed. Id. at 10.

9) Plaintiff's medical history subsequent to the altercation with V.A., including objective imaging tests, also contradict his claim that the May 8, 2014 assault is the sole possible cause of his claims of continued pain [id. at 11]; and

10) Plaintiff's administrative grievance history contradicts his claim that filing grievances in USP Hazelton's SHU was impossible. Id. at 12.

Defendants attach numerous exhibits to their dispositive motion. See ECF Nos. 156-1 - 156-9.

## C. **Plaintiff's Response in Opposition**

Plaintiff first addresses the Defendants' allegations of his past manipulative behavior, providing various justifications for each. ECF No. 163-1 at 1 – 5. He then reiterates his

allegations and arguments regarding his May 8, 2014 failure to protect claim; provides argument to refute the Defendants' arguments on the same; provides additional detail about his claims and makes several new allegations, stating that both he and V.A. had "bottom bunk restrictions," which contributed to their conflict, and that the BOP discontinued V.A.'s psychiatric medications the day they were celled together.  Id. at 6 – 20; ECF No. 163-3 at 2; ECF No. 163-6 at 1; ECF No. 163-12 at 1; ECF No. 163-13 at 1 – 2; ECF No. 163-14 at 1 – 2; ECF No. 163-15 at 1 – 2. Plaintiff attaches multiple sworn declarations to his response, as well as copies of the Defendants' sworn declarations, on which he has circled or underlined portions of text or made notations thereto; a copy of inmate V.A.'s May 8, 2014 incident report for "assaulting any person [ECF No. 163-3 at 1 – 2]; two copies of his own May 7, 2014 incident report for destroying government property valued less than $100 [ECF No. 163-7 at 1-3; ECF No. 163-11 at 1-3], and an excerpt from his medical records. ECF No. 163-8 at 1.

### III. Standard of Review

**Motion for Summary Judgment**

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586. The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.' Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587.

## IV. Analysis

### Qualified Immunity and Plaintiff's Failure to Protect Claim

The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed. 2d 811 (1994).  "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" Id. at 834 (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed. 2d 59 (1981). "For a claim based on failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm," and that the prison officials acted with "'deliberate indifference' to inmate health or safety.'" Id. The Supreme Court left open the point at which a risk of inmate assault becomes sufficient for Eighth Amendment purposes. Id. n3. However, the Supreme Court

held that "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. at 837. Furthermore, the Eighth Amendment is not violated by the negligent failure to protect inmates from violence; a plaintiff must show that the defendants knew of the risk and consciously disregarded it. Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed. 2d 251 (1986); Moore v. Winebrenner, 927 F.2d 1312 (4th Cir. 1991).

With regard to qualified immunity, the United States Supreme Court has provided that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir. 1992). The analysis of the defense of qualified immunity is examined using a two-step analysis. Saucier v. Katz, 533 U.S. 194 (2001). The first step is to determine whether the facts alleged show that the defendants' conduct violated a constitutional right. Id. at 201. If the facts so viewed do not establish a violation of a constitutional right, the plaintiff cannot prevail, and "there is no necessity for further inquiries concerning qualified immunity." Id. However, if a favorable view of the facts does establish such a violation, the next step is to determine whether the right violated was clearly established at the time of the alleged offense. Id. If the right was not clearly established, the defendants are entitled to qualified immunity. Id.

Here, upon review of the new evidence provided by the parties incident to discovery and Defendants' motion for summary judgment, now before me are: a copy of the sworn Declaration

of non-party Tiffanie Little, Legal Assistant at the BOP's Mid-Atlantic Regional Office ("Little Decl.")[ECF No. 156-2 at 1 – 3]; excerpts from Plaintiff's medical records [ECF No. 156-4 at 21 - 397]; a copy of a May 8, 2014 Incident Report [ECF No. 156-2 at 122]; a copy of the sworn Declaration of non-party Brian Crowe, Correctional Services Specialist for the BOP's Mid-Atlantic Region ("Crowe Decl.") [ECF No. 156-6 at 1 – 3]; a copy of Plaintiff's Public Information Inmate Data as of August 10, 2018 [id. at 5 – 7]; a July 7, 2014 Memorandum designating Plaintiff and V.A. as inmates subject to Central Inmate Monitoring Assignment of Separation ("CIMS") for the first time [id. at 9]; copies of Plaintiff's and V.A.'s Chronological Disciplinary Records [ECF No. 156-2 at 5 – 28]; copies of Plaintiff's and V.A.'s Inmate History Quarters Reports [id. at 30 – 41]; a copies of Plaintiff's Administrative Remedy Generalized Retrieval [id. at 43 – 120];  photos of Plaintiff's injuries from the May 8, 2014 incident [ECF No. 156-4 at 399 – 4012]; a copy of the sworn Declaration of non-party Nicholas Barrientos, Special Investigative Services ("SIS") Lieutenant at USP Hazelton ("Barrientos Decl.") [ECF No. 156-3 at 1 – 4]; copies of Hazelton employees' Daily Assignment Roster for the dates of May 4, 2014, May 5, 2014, and May 7, 2014 [id. at 6 – 14]; copies of USP Hazelton SHU 30-Minute Rounds Logs for the dates of May 2, 2014 through May 10, 2014 [id. at 28]; a copy of the USP Hazelton SHU Visitor Log for the dates of May 4, 2014 through May 10, 2014. Id. at 30 – 33.

There is also a copy of a March 12, 2016 psychiatry/psychology Competency and Responsibility Evaluation for Plaintiff, deeming him competent, despite his history of self-harm and initiating hunger strikes as "behavior measures necessary" to achieve his goals, such as obtaining desired medical attention  [id. at 35]; a copy of a November 26, 2013 Request for Transfer/Application of Management Variable for Plaintiff, finding Plaintiff a "management

problem" for threatening staff and other inmates regarding his desire for placement in the SHU, increasing Plaintiff's security level to "high." Id. at 37.

Also included is a copy of an October 26, 2016 Incident Report charging Plaintiff with refusing a program assignment and refusing an order, for refusing to be released from the MD Annex back to the compound [id. at 39 ]; a copy of an August 14, 2014 Incident Report charging Plaintiff with refusing to work or accept a program assignment, for refusing to be released from the SHU back to general population [id. at 41]; a copy of a July 22, 2016 Incident Report charging Plaintiff with refusing to accept a program assignment and refusing to obey an order by staff to accept a cellmate [id. at 43]; a copy of a November 5, 2015 Incident report, charging Plaintiff with refusing to work or accept programs, refusing to obey an order, and insolence toward staff for Plaintiff's profane outburst and threats toward others regarding his insistence on being placed in the SHU [id. at 45]; a copy of a March 26,  2018 BOP Psychology Services Post Suicide Watch Report [id. at 47 - 48]; a copy of an August 2, 2013 Memorandum to OPS Lt. Snyder from Dr. Lang, DAPC regarding Plaintiff's aggressive threats to hurt other inmates if he did not get his requested placement in the SHU [id. at 50]; a copy of BOP Program Statement 5270.11, Special Housing Units [id. at 52 – 69]; a copy of the sworn Declaration of non-party Gretchen Ryle, Health Services Administrator for the BOP's Mid-Atlantic Region ("Ryle Decl.") [ECF No. 156-4 at 1 – 19]; a Supplemental Declaration of Jerald Riffle ("Riffle Supp. Decl.") [ECF No. 156-5]; a Supplemental Declaration of Christopher Mullen ("Mullen Supp. Decl.") [ECF No. 156-7]; a Supplemental Declaration of John Brady ("Brady Supp. Decl.") [ECF No. 156-8]; a Supplemental Declaration of Brad Brown ("Brown Supp. Decl.") [ECF No. 156-9]; and a transcript of Berryman's deposition testimony. ECF No. 165-1.

Here, the fact that Plaintiff was assaulted by V.A. on May 8, 2014 is undisputed by the parties.   However, the record shows that Plaintiff previously admitted to a substantial history of prior severe injuries in the areas of his spine in which he now claims to have sustained assault-related injuries. While both parties have produced conflicting affidavits, Plaintiff's affidavits are comprised of conclusory allegations or lack support in the record.   There is no proof that Defendants were deliberately indifferent to a risk to Plaintiff's safety.

Moreover, Plaintiff's injuries from the assault appear to have been *de minimis*, given that he refused care immediately afterward, did not present for medical care at all for one week and only complained of minor aches and pains then, and offered little complaint about his alleged injuries at all, until approximately six months later, after he left USP Hazelton.  Further, most of his claims of injury are in areas of his spine where he neither alleges he was struck nor was witnessed being struck. His only documented finding of injury that could even be remotely attributed to the assault was a finding, eight months later, on a CT scan (after intervening x-rays failed to document any injury) of old rib fractures; however, Plaintiff did not exhibit acute signs or symptoms of broken ribs at the time of the assault or in the months thereafter, as would be expected had the ribs actually been fractured at that time. Nonetheless, even if the rib fractures, or indeed, any of his other claimed injuries were attributable to the May 2014 assault, such a finding would be irrelevant, given that there is no evidence that Defendants were deliberately indifferent, and negligent failure to protect does not violate the Eighth Amendment. Finally, Plaintiff's contradictory statements, and his obvious embellishment of the facts over time, particularly regarding his alleged injuries, lead to the conclusion that Plaintiff's credibility is seriously in question and his claims have no support in the record.

15

Here, each Defendant has filed a Supplemental Declaration; Defendant Brady's avers that as a Senior Officer Specialist in USP Hazelton's SHU, he conducted rounds at least once every 40 minutes, which required him to walk past every cell in the SHU; in doing so, any inmate could verbally tell him about a concern or hand him a written complaint.  ECF No. 156-8 at 2.

Defendant Mullen avers that when he worked at USP Hazelton in the SHU as a Senior Officer Specialist in May, 2014, at least once per shift, he conducted rounds there, requiring him to walk past each cell in the SHU; while doing so, any inmate could interact with him to convey their concerns. ECF No. 156-7 at 1 – 2.

Defendant Brown avers that as a Senior Officer Specialist in USP Hazelton's SHU, he was required to visually observe every inmate in the SHU at least twice an hour; therefore, every thirty minutes, at random intervals, he conducted rounds in the SHU.  In an 8-hour shift, this meant that he would conduct approximately 16 rounds in the various SHU ranges, walking past every cell in each range.  While doing so, any inmate could ask questions or convey concerns, either verbally or in writing.  ECF No. 156-9 at 1 – 2.

Defendant Riffle avers that in May, 2014, when he was serving as a Lieutenant in USP Hazelton's SHU, at least once a day, he conducted rounds in the SHU, walking past each inmate's cell; further, he talked to each SHU inmate at least weekly regarding their status and updated them on why they were there. He also routinely delivered "at least ten to fifteen" incident reports a day to SHU inmates.  At any of these times, when he was walking past each inmate's SHU cell, any inmate could convey a concern to him, either verbally or in writing. ECF No. 156-5 at 1 – 2.

Defendants also produce SHU 30-Minute Rounds Logs [ECF No. 156-3 at 16 – 28]; SHU Visitor Logs for the relevant dates [id. at 30 – 33], to show how frequently BOP staff of all kinds

pass through the SHU on a daily basis; it is apparent that someone passed through at least every thirty minutes, often more frequently than that.  Plaintiff's response in opposition attempts to dispute this, claiming that SHU staff "would go to the end of the walk," repeatedly sign their names, and "then come back at a later time and fill in the times to show they had walked rounds when they hadn't." ECF No. 163-1 at 10. This conclusory allegation appears to be pure speculation on Plaintiff's part, because he has no way to know what staff wrote and when they did it. Nevertheless, it appears implausible that with as many BOP staff passing through the SHU each day as there undoubtedly were, Plaintiff has produced no evidence beyond his own unfounded allegations, to show that any other person heard his claims of fear or pleas to be moved.

Defendants' supplemental affidavits all aver that Plaintiff never reported any fear of V.A. to any of them prior to the assault, nor did V.A. ever convey malicious intent toward Plaintiff to any of them. ECF Nos. 156-5 at 4 – 5; 156-7 at 2; 156-8 at 2 – 3; 156-9 at 2.  The Defendants aver that working in the Hazelton SHU, a volatile environment housing as many as 238 inmates, many of whom had already been disruptive in general population, required constant vigilance and therefore, threats of violence there were taken very seriously by staff, whether the threats were against inmates or staff; thus, all possible precautions were taken to avoid the unnecessary risk that physical violence poses to staff and inmates.  ECF Nos. 156-5 at 3; 156-7 at 1; 156-8 at 1; 156-9 at 1.  Plaintiff's verified response in opposition disputes this [ECF No. 163-1 at 9]; as do his declarations on the point; he reiterates his claims that he told each of the Defendants of his fear of V.A. and requests to be moved. ECF Nos. 163-3; 163-12; 163-13; 163-14.  He also avers that SHU staff, officers, and SIS did not take threats of violence seriously, that they would "turn there [sic] back to it because it involved work and they did as little [work] as possible and if an

17

inmate caused them to do extra they would retaliate on him for it." ECF No. 163-1 at 9. Again, Plaintiff's self-serving allegations have no independent support in the record and are contradictory in various ways, as will be explained in greater detail *infra*.

Despite Plaintiff's complaint claims that in the days preceding the assault, he approached numerous correctional offices who passed through the SHU, expressing his fear of V.A. and begging to be moved [ECF Nos. 1 at 11 – 14], beyond his own bare allegations, there is no independent proof in the record to support such claims. Moreover, records of a sick call encounter in the SHU in the early morning of May 7, 2014 indicates that Plaintiff's only complaint to medical staff was swollen ankles; he did not report being afraid of his cellmate or wanting to be moved. ECF No. 156-4 at 29 – 30.

While Plaintiff's complaint makes no mention of it, in his August 13, 2018 deposition, he testified that on May 7, 2014, despite having repeatedly told Plaintiff to get out of the cell, inexplicably, V.A. began *interfering with* Plaintiff's efforts to tell staff that passed their SHU cell about his fears and request to be moved, by getting in front of him at the cell door, "screaming and hollering . . . and cussing [ECF No. 165-1 at 56 – 60]," thereby driving everyone away, so that Plaintiff could not get to the door to speak to anyone. Specifically, Plaintiff identified a male counselor and a female psychologist who were driven off in this manner [id. at 56 - 57] and Officer John Doe II. Id. at 61 - 62.  In his response in opposition to the Defendants' pointing out the contradiction, Plaintiff reiterated the claims and insisted that his deposition testimony was not inconsistent. ECF No. 163-1 at 9. Nonetheless, this claim has no support in the record; Defendants produced the sworn declaration of Nicholas Barrientos, SIS Lieutenant, who averred that if V.A. had actually behaved in such a belligerent, disruptive manner, staff would have either disciplined him or removed him from the cell.  Barrientos Decl., ¶ 25 at 4. However, the

only infraction noted in V.A.'s disciplinary history during the time he shared the cell with Plaintiff is the May 8, 2014 assault. ECF No. 156-2 at 26.

Defendants also aver that prior to the May 8, 2014 assault, Plaintiff and V.A. were not classified as requiring separation, thus, there was no directive prior to that date to warn BOP staff to keep them apart.   ECF No. 156-6, ¶ 11 at 3.   They attach a copy of a July 7, 2014 Memorandum for C.T. Pulice, Case Management Coordinator, from P. Landon, Unit Manager, Subject: CIMS Separation, averring that upon review of V.A.'s June 30, 2014 Discipline Hearing Officer ("DHO") Report, based on the "severity" of the incident,[4] during which V.A. was witnessed kicking Plaintiff's head and upper torso, a threat determination between the two had been made, and thereafter, they were to be designated as Central Inmate Monitoring Assignment of Separation ("CIMS") separatees, to prevent future incidents. ECF No. 156-6 at 9.

In arguing otherwise, *inter alia*, Plaintiff appears to argue that Defendants should have been on notice of the risk V.A. posed to him because V.A was known to have a violent nature, after having previously assaulted at least three other inmates. ECF No. 1 at 11; ECF No. 165-1 at  37, 53; ECF No. 163-1 at 7 - 8. Defendants produced a copy of V.A.'s disciplinary records dating from April 23, 2012 through May 16, 2018, refuting this, showing that prior to his May 8, 2014 assault on Plaintiff, V.A. had only ever been charged with one assault, an "assault without serious injury," using his fists, before he attacked Plaintiff. ECF No. 156-2 at 26. Nonetheless, even if V.A. had committed other prior assaults, violence by a particular inmate does not necessarily establish that that inmate will assault again.

---

[4] Despite the fact that V.A. was witnessed kicking Plaintiff while Plaintiff lay on the floor, V.A. was only charged with a Code 224 violation, for "assaulting w/o serious injury," "using fists."  ECF No. 156-2 at 26. The record does not indicate whether V.A. was unshod when he kicked Plaintiff, or whether he wore shoes.  The undersigned surmises that because the assault began at around 3:30 a.m., when both V.A. and Plaintiff had been in bed for several hours, that V.A. likely kicked Plaintiff with his bare feet, which might account for the "using his fists" description of the attack, given that kicking while wearing shoes could be construed as using a weapon, which would cause far greater injury.

In addition, to the extent that the complaint alleges that on May 6, 2014, in response to Plaintiff's reports of threats from V.A. and pleas to be moved made to other officers and conveyed to Defendant Riffle by Officer John Doe II and others, Riffle gave orders that Plaintiff was not to be moved, and that those officers then passed the news of the refusal on to Plaintiff [ECF No. 1, ¶ 6 at 11], Plaintiff's subsequent testimony and responses have been contradictory. At deposition, he testified that Riffle refused the move on May 4 or May 5, 2014 [ECF No. 165-1 at 43 – 51], at first stating it was via an indirect communication [ECF No. 165-1 at 51]; later, he testified that it was in face-to-face communication, where he pleaded with Riffle and Riffle ignored him. ECF No. 165-1 at 95, 105. Defendants produced evidence to show that Riffle did not even work May 4 or May 5, 2014.[5] ECF No. 156-3 at 8, 11. In his response Defendants' summary judgment motion, which pointed out these inconsistencies, Plaintiff then claimed the attempted communications were two face-to-face conversations the evening of May 7, 2014, one of which Riffle ignored, and the other, to which Riffle responded "it's not going to happen." ECF No. 163-1 at 20. Plaintiff also provided a sworn declaration on the point, stating that "on May 7, 2014 [he] did tell . . . Riffle on 2 occasions that . . . [he] was in fear of being assaulted and or killed and raped by my cellmate V.A. . . . [and] [o]n 2 occasions the evening of May 7, 2014 I informed . . . Riffle . . . ignored my plea[] for help." ECF No. 163-12 at 1.

Further, Plaintiff's complaint alleges that while Defendant Mullen was making rounds in the SHU on May 7, 2014, he begged Mullen to move him, but Mullen refused, saying he had orders not to [ECF No. 1, ¶¶ 29 – 30 at 14]; and that after the assault, Mullen was the one who assisted him and removed him from the cell. ECF No. 1, ¶ 34 at 14. As noted *supra*, both of Mullen's declarations deny that Plaintiff ever expressed fear of V.A. or asked him for help before the assault [ECF Nos. 52-3 at 2, 156-7 at 2], and Mullen's first declaration denied that he

---

[5] Neither Riffle's original nor his supplemental declaration specifically address this point.

was the one who assisted Plaintiff after the assault. ECF No. 52-3 at 2. Attached to their first dispositive motion, Defendants produced the declaration of non-party Lt. Alex Harrison, [ECF No. 52-6] and attached to the instant motion, for the first time, they produce a copy of a contemporaneously-created May 8, 2014 Incident Report prepared by Senior Officer C. Pacholke [ECF No. 156-2 at 122]; the record appears to indicate that Harrison and Pacholke, and not Mullen, were the first officers who arrived to break up the assault; Pacholke's Incident Report indicates that he took control of V.A. [ECF No. 156-2 at 122], and Harrison's declaration implies that he is the one who assisted Plaintiff. ECF No. 52-6 at 2.

Plaintiff's complaint contends that on May 7, 2014, after V.A. created a disruption and both inmates were temporarily removed from their shared cell, when Defendant Brown arrived to effectuate the first move, he begged Brown to separate him from V.A. but Brown ignored him. ECF No. 1, ¶ 16 at 12. His deposition testimony, on the other hand, is inconsistent and contradictory; at first he testified that when Brown became so annoyed with V.A. for pushing the duress button that he left; when Brown returned with the unknown officers and ordered Plaintiff and V.A. cuff up, Plaintiff asked Brown to remove him from the cell, but that Brown "just ignored me." ECF No. 165-1 at 66. Later, he testified that he asked Brown twice to remove him from the cell, once when V.A. was pushing the duress button and Brown first came to tell him to stop, but "Brown didn't want to talk to me [id. at 68]," and a second time, when Brown returned again to tell V.A. to stop pushing the button; Brown again ignored him, because "[h]e didn't even speak to me. I was the least of his concerns. His concern was that emergency button. Id. at 69. However, a careful review of Plaintiff's response in opposition reveals that it contradicts the version of events in both the complaint and his deposition testimony. In a "supplemental declaration" attached to the same, he contends that he told Brown twice that he was afraid of

V.A. and begged him to move him, but that the first time, Brown "looked at me and just walked away[,] saying that he wasn't doing nothing," and the second time, "he completely ignored me because he was very irate with V.A." ECF No. 163-3 at 2.

Plaintiff's complaint alleges that after he and V.A. were removed from their cell, the cell searched, their belongings and clothing confiscated, and they were given paper clothes, he begged Defendant Brady not to put him back in the cell with V.A., but Brady refused and put him back in with V.A. anyway. ECF No. 1, ¶ 24 at 13. At his August 13, 2018 deposition, Plaintiff testified that Brady, who usually worked the day shift, was there the evening of May 7, 2014, perhaps "doing overtime." ECF No. 165-1 at 71.   Defendants contend that no conversations with Brady could possibly have occurred that day, because Brady did not work on May 7, 2014 [ECF No. 156-3, ¶ 6 at 2]; they produce a copy of the USP Hazelton Daily Assignment Roster of Hazelton SHU staff's work assignments, proving that Brady was off that day.[6] See ECF No. 156-3 at 14.  In response, Plaintiff insists that he did talk to Brady that day, now alleging for the first time that Brady was working on his day off, wearing street clothing, and that "it is a common practice of Officers to come in on there [sic] days off." ECF No. 163-1 at 8.  Plaintiff also attached a sworn declaration on the point. ECF No. 163-14 at 1 – 2. The undersigned finds Plaintiff's contradictory responses suspect, and further finds it unlikely that a BOP employee would come in to work when not scheduled to do so, wearing street clothing.

Finally, it appears from the record that the May 8, 2014 assault was over and done with within a maximum of four minutes: Berryman hit the emergency alarm at ~ 3:31 a.m. [ECF No. 156-2 at 122]; staff responded by ~3:32 a.m. [ECF No. 52-6 at 2]; and by 3:35 a.m., Berryman had already been cuffed, removed from the cell, and was being

---

[6] Neither of Brady's sworn declarations specifically address the issue of whether he worked that day. See ECF No. 52-4, ECF No. 156-8.

photographed. ECF No. at 156-4 at 399 – 402]; ECF No. 156-4 at 399 – 402. It does not appear possible that the assault lasted long enough to permit Berryman to beaten to the point of unconsciousness and regain consciousness twice, as he claims. Further, Plaintiff's claim that he "passed out" a third time, after being assisted to another cell after the assault appears unlikely, given that the photos taken of him at 3:35 a.m. show him standing unaided, appearing calm and alert.

A careful review of the record supports Defendants' claim that Plaintiff refused medical care when seen by Health Services approximately two hours after the assault, but was observed to have only minor injuries, i.e., superficial abrasions to his right eyebrow and knees, and two small bruises to his forehead. ECF No. 156-4 at 31 – 33. The photos taken at 3:35 a.m., immediately after the assault, corroborate the Defendants' contention that Plaintiff's assault-related injuries were *de minimis*.  ECF No. at 156-4 at 399 – 402. At deposition, Plaintiff denied that any photos were taken of him after the assault. See ECF No. 163-1 at 80. In his response to Defendants' summary judgment motion, to which copies of the photos were attached, Berryman now argues that those photos were not photos of his May 8, 2014 assault injuries [ECF No. 163-1 at 7; see also ECF No. 163-15 at 1 – 2], but rather, were photos of injuries sustained in a later assault by inmate "Dunn." ECF No. 163-1 at 6 - 7. Given that Plaintiff's medical records indicate that the altercation with inmate "Dunn" occurred on July 21, 2014, the obvious blood on Plaintiff's face in the May 8, 2014 photos is clearly consistent with his injuries from that assault, not from the July 21, 2014 altercation with Dunn.[7] Clearly, the

---

[7] Plaintiff disputes the date on the photos, arguing that "there are no abrasions on Plaintiff as recorded by P.A. Meyer," such as "abrasions on his knee's [sic] and the Cut's [sic] "open wounds" on his face do not match-up with the . . . report [by] P.A. Meyer[.]" ECF No. 163-1 at 7. In a sworn declaration, he identifies the date of the assault by inmate Dunn as July 21, 2014; contends that the photos actually show an "old cut" over his eye, sustained in the May 8, 2014 assault by V.A., but also "a new fresh one on the side" of his right eye, from the assault by Dunn; and that the paper shorts he wore in the pictures were given to him on July 21, 2014.  See ECF No. 163-15 at 1 – 2.

photos were not taken on July 21, 2014, Plaintiff's sworn declaration on the point notwithstanding.

One week after the assault, Plaintiff finally sought care, complaining of pain in the back of his neck and center of his back; but no redness or tenderness was found in either place; there was some old (yellowed) bruising to his right forearm, left wrist and thumb, and left lateral rib area, but there was no deformity to any of these areas to indicate fracture; x-rays were not recommended; and Plaintiff received a prescription for one week of twice-daily ibuprofen 800 mg. ECF No. 156-4 at 34 – 35. While Plaintiff insists that the nurse who examined him that day noted "all the swelling" and bruising "which was black, blue, and yellow," told him his ribs were broken and that he would "put . . . [him] in for x-rays" [ECF No. ECF No. 1 at 15], the record does not support such claims.

---

Defendants' five (poor-quality) color photos of Plaintiff, labeled as taken on May 8, 2014 at 3:35 a.m., immediately after the assault, show Plaintiff standing calmly, cuffed behind his back, wearing what appear to be paper shorts and no shirt. In the only picture that includes his lower legs down to his ankles, any view of his knees is obscured because the shorts are so long. See ECF No. 156-4 at 402.

The photos do reveal some sort of skin break sort over Plaintiff's right eyebrow, with bleeding that ran down over Plaintiff's right check and down his nose, and perhaps, into his beard [id. at 399, 401]; the blood appears to have dried on his nose; however, the photo is not clear enough to reveal whether the injury sustained was a laceration or abrasion. The 1 – 2 cm contusions to Plaintiff's right and left forehead described by Meyer are not visible in either photo of Plaintiff's head, taken from the right and left [see id. at 401], or in the close-up shot of his face. Id. at 399.

However, in the last photo, take from a distance, Plaintiff is facing the camera with his head turned slightly to the right, there appears to be the suggestion of a small reddish mark, possibly the beginnings of an early bruise on the left side of Plaintiff's forehead. Id. at 402.  The photo of the back of Plaintiff's upper torso, extending down to below his waist, with his hands cuffed behind him, shows no visible swelling or redness; other than what might be a tiny abrasion on the right shoulder blade, near his armpit [ECF No. 156-4 at 400], otherwise, there is no visible injury at all, even on his neck or arms. There is a partial view of a tattoo on the inside of his lower right arm. Id.

The next picture, taken from his left side, from the waist up, shows no visible redness, abrasion, contusion, or other injury [ECF No. 156-4 at 401]; likewise, in the photo of his right side, showing him from the shoulders up, there is no apparent redness, bruising or contusion of the shoulders, chest, or neck. Id.

The final photo shows Plaintiff standing, facing the camera, with his head turned slightly to the right; there appears to be a tiny reddened area on the front of his right upper arm, and possibly, a slightly larger one, on the front of his right mid-rib area.  Id. at 402.

Among the copies of Plaintiff's medical records produced is a July 21, 2014 5:32 a.m. BOP Health Services Clinical Encounter at Hazelton, where Plaintiff was seen for minor injuries, described as tenderness and trauma, sustained in "altercation with cellmate DUNN."  ECF No. 156-4 at 47.  He was noted to have "three 2cm contusions to forehead. **skin intact. no bleeding** . . . [and some] erythema [redness] to right 4th/5th MCP ("MCP = metacarpals; the fourth and fifth metacarpals are the ring and "pinky" fingers).  Id. (emphasis added).

On May 26, 2014, Plaintiff, by then on another hunger strike, refused medical assessment and was noted to be walking around in his cell without any difficulty. ECF No. 156-4 at 37.

Plaintiff offered no further assault-related injury complaints until June 2, 2014, when he reported "residual aches to chest" and some neck pain [ECF No. 156-4 at 38 – 40]; however, a musculoskeletal exam of his cervical, thoracic, and lumbar spine was normal, as was an examination of his chest wall, and he was again noted to be walking without any difficulty. Id.

He was seen for a complaint of cardiac chest pain on July 7, 2014 and treated with nitroglycerine; he made no mention of pain from the May 8, 2014 assault.  ECF No. 156-4 at 43 – 46.

On July 21, 2014, he was seen again, after the altercation with inmate "Dunn," where, as noted *supra*, he sustained contusions to his face, some redness to his fingers, and several small bruises to his forehead; he only reported pain at a level "3" on a pain scale of 0 – 10, with 10 being the worst.  ECF No. 156-4 at 47 - 49. Despite Plaintiff's instant claim that his ribs had been broken only two months and one week earlier, the P.A. who examined him noted that an examination of his chest wall was normal. Id. at 47.

He was transferred to an outside hospital on August 15, 2014 for another complaint of cardiac chest pain, but apparently reported no assault-related pain there, either. ECF No. 156-4 at 55 – 60.

At an August 21, 2014 sick call visit at Hazelton's SHU, despite having never complained of being kicked or struck in the low back on May 8, 2014, he reported low back pain "from altercation several months ago." ECF No. 156-4 at 61 – 62. The provider noted

25

he had been using ibuprofen; appeared well; his neck exam was within normal limits; and a musculoskeletal exam of his cervical, thoracic, and lumbar spine were all normal; he had full range of motion; and his gait was normal. Id.

Plaintiff was transferred from Hazelton on October 7, 2014. ECF No. 156-2 at 33. After expressing minimal assault-related pain complaints for the first six months and exhibiting the ability to easily walk independently and perform his activities of daily living, once out of Hazelton, his reports of pain and its severity began to increase.  At first, his complaints of increasing pain were related to his right inguinal hernia [ECF Nos. 156-4 at 80, 87, 90, 93, 110], by mid-to-late November 2014, he also complained of rib and back pain, and by January 2015, he included complaints of neck pain. ECF No. 156-4 at 101-2.

Medical staff could find no physiological reasons for Plaintiff's complaints of severe pain, and his increased complaints did not comport with radiological findings of mild degenerative disc disease and osteoarthritis; musculoskeletal exams; ability to move; or any other objective findings beyond the already-diagnosed osteoarthritic changes to his spine. ECF No. 156-4 at 146 – 151; see also id. at 319 – 24 (at an April 10, 2017 neurosurgery consult, he was noted to have "severe lumbar stenosis at L4-6 and moderate stenosis at L3-4 from spondylosis, which has been present and unchanged from May of last year . . . [which] does not account for his inability to stand and walk.").

Often Plaintiff would insist he had severe pain while appearing calm and comfortable, or while easily demonstrating the ability to move, stand, roll over, or propel his own wheelchair, without so much as a grimace. See ECF Nos. 156-4 at 87 – 88, 120, 156, 201, 213, 234, 247 – 49, 255. See also id. at 288 – 90 ("[i]nmate does continue to complain of all over pain which is normal for inmate . . .[but] not showing signs of distress."); ECF

26

No. 331 – 33 (at a July 28, 2017 pain management clinic visit, while reporting pain at a level of "10," he was observed coming in and out of the office using a wheelchair and did not appear to be in any distress during the interview).

For instance, at an October 24, 2014 sick call visit at FCI Florence, Berryman reported pain in his neck, left rib cage, lower back and right hip, at a level of "8" on a scale of 0 – 10; the pain in his neck radiating to his arms, and the pain in his lower back radiating to his legs. ECF No. 156-4 at 63 – 65. He claimed that all of his symptoms were a result of the May 8, 2014 assault.  Id. On exam, no gross deformity was found in any of these areas; a musculoskeletal exam of his cervical spine found only some tenderness; his thoracic spine was normal, as was his lumbar spine, although he claimed to have limited ability to bend over, because of pain. Id.

X-rays were ordered and performed that day, for "pain in neck, thoracic, and lumbar spine, left rib cage and right hip secondary to an alleged assault by another inmate in May, 2014 while in USP Hazelton." Id. The x-rays of his left lower anterior ribs were negative [ECF No. 156-4 at 66]; as were the x-rays of his cervical spine. ECF No. 156-4 at 67. X-rays of his thoracic spine were negative except for some mild degenerative disc disease and osteophytosis.[8] ECF No. 156-4 at 70. X-rays of his pelvis and right hip found sclerotic lesions[9] in the right iliac wing and superior pubic ramus, and CT exam was recommended

---

[8] Osteophytes, more commonly known as "bone spurs," are outgrowths of bone tissue that form around damaged joints, thought to be a compensatory response to bone and ligament damage, and is meant to restrict movement of the joint to protect from further damage. Joints that are prone to damage from overuse and arthritis, such as those in the spine and hands, are most likely to develop osteophytes, though any bone can develop them. See Clinical Cases – Osteophytosis, *available at* < https://anatomy.elpaso.ttuhsc.edu/clinicalcases/osteophytosis/osteophytosis.html >

[9] A sclerotic lesion is an unusual hardening or thickening of the bone. They can affect any bone and be either benign (harmless) or malignant (cancerous). They are generally slow-growing.  If benign, they are asymptomatic and patients are usually unaware that they have them until an X-ray or other imaging scan done for another condition reveals them. If malignant, they may cause pain, stiffness or swelling. See Everything You Need to Know About Sclerotic Legions, *available at* < https://www.healthline.com/health/sclerotic-lesions >

for further follow up. ECF No. 156-4 at 68. His lumbosacral spine x-rays were negative except for mild degenerative disc disease, some "anterior wedging" at the T12[10] vertebra, and a marginal osteophyte at the left-side of the lumbar 1 – 2 vertebrae. ECF No. 156-4 at 69. At an October 28, 2014 follow-up visit which noted that Plaintiff had mild degenerative disc disease of the entire spine with abnormalities in his right hip, a consultation for an orthopedic consult was made. ECF No. 156-4 at 71.

On November 11, 2014, per his request, Plaintiff was loaned a wheelchair. ECF No. 156-4 at 75. His medical records are replete with documentation that the reason Plaintiff requested the wheelchair that day was because he had groin pain from a bulging, "fat-filled" right inguinal hernia that was becoming increasingly difficult to manually reduce, for which he was awaiting surgical repair [ECF No. 156-4 at 72, 96 – 98, 120 – 121], not because of any injury related to the May 8, 2014 assault. There are multiple references in the record indicating that no medical reason could be found for Plaintiff's claimed need for the wheelchair; in the interest of brevity, only a few are included here.[11] The hernia was finally repaired at some point

---

[10] Anterior wedging indicates a prior compression fracture of the anterior portion of a vertebra.  See Vertebral Wedge Fracture, *available at* < https://www.spineuniverse.com/conditions/osteoporosis/vertebral-wedge-fracture >

[11] At a February 17, 2015 medical visit, Berryman was advised that his complaints of pain were disproportionate to his physical exam findings; there was no need for the narcotics he was demanding; and that "the exacerbations of his neck and upper back pain  are  most  likely related to  him  pushing his wheelchair which . . . might be is not needed. . . it is my impression that this inmate will keep complaining of pain no[] matter what.  It is my clinical opinion that he does not require[] additional  analgesics  or  narcotics.  ECF No. 156-4 at 104 – 05 (emphasis added).  Before 4:20 p.m. that day, Berryman deliberately ingested 150 of his metoprolol 50 mg tablets and 17 isorbid 3 mg tablets [ECF No. 156-4 at 106 – 09]; at the hospital emergency room afterwards, he denied depression or suicidal feelings, and advised staff that "he took the overdose to get medical attention for his back (or possibly hernia) because he felt he was being ignored." ECF No. 156-4 at 110 – 16.

At a March 2, 2015 BOP Clinical Encounter, although Berryman insisted on using the wheelchair, medical staff noted that he could easily move his upper and lower extremities with no sign of weakness, had no muscle atrophy from non-use, could rise from the chair unassisted; ambulate independently with a symmetrical and unrestricted gait; stand on a scale to be weighed, and move both legs without signs or symptoms of distress or limitation. ECF No. 156-4 at 120 - 123.

On April 27, 2015, medical staff noted Berryman's history of reported pain from pre-BOP injuries, including falls, being run over by a car, fractures, etc., commenting that Berryman had referenced generalized pain as early as January 2013 and that the pre-incarceration  injuries Berryman described would make back and neck pain

after March 6, 2015.  ECF No. 156-4 at 146. Nonetheless, Plaintiff refused to give up the wheelchair; as early as March 5, 2015, before the hernia repair, after USP Florence medical staff informed Berryman, who was again attempting to get narcotics, that there was no "clinical or imaging evidence to support his pain claims," Berryman replied that it was "because . . . [you] do not want to find evidence and . . . [you] do not want to [do] the right tests," and advised staff that he would not give back the wheelchair even after the hernia was repaired.  ECF No. 156-4 at 128 – 29. On March 6, 2015, a BOP nurse practitioner noted that Berryman was **complaining of all these [pain] issue[s] because he does not want to lose the wheel chair after the hernia surgery.  He admits that he wants to make a case for us to prescribe him stronger pain medications**. I offer him to get x-ray of these joint[s], but he claim[s] that our "x-ray machine does not work because it doesn't show his injuries." ECF No. 156-4 at 130 – 32 (emphasis added).

On November 25, 2015, after having insisted he could not get out of his wheelchair because of the pain only four days earlier [ECF No. 163 – 66], at a Health Services Physician Hunger Strike encounter, Berryman readily transferred to the wheelchair for weight and blood pressure check and was "[o]bserved able to get up from supine to sitting upright and able to transfer from the bed to wheelchair with no limitations. Moves lower extremities, no limp, no involuntary movements. 5/5 motor on all extremities."  ECF No. 156-4 at 213 – 16.

On March 1, 2016, a nurse was delivering Berryman his medication through a slot in his cell door when Berryman suddenly stuck his arm through the slot and tried to punch the nurse;

---

"very likely, indeed almost probable." ECF No. 156-4 at 149. Medical staff further noted that Berryman had been mobile until staff gave him the wheelchair in November 2014 as a comfort measure for his hernia, not for any musculoskeletal deformity or restriction, and that there was no reason to suspect any musculoskeletal or neurological basis for a disability that required a wheelchair. Id. Medical staff further opined that Berryman's back pain was "no more significant than the average American with mild to moderate degenerative joint disease of the spine," and that he should take nonsteroidal anti-inflammatory medication. Id.

medical staff noted that this behavior was a "clear indication" that Berryman "does not have restricted or limited movement that he claims was due to severe musculoskeletal pain." ECF No. 156-4 at 247 – 49.  Medical staff noted that Berryman insisted on using a wheelchair despite the fact that he has "well developed arms and legs." Id.

Although the voluminous medical records document several years of testing and many imaging studies done (most of which are not included here) in an attempt to diagnose Plaintiff's ever-increasing claims of pain related to the May 8, 2014 incident, such pain, if Plaintiff experiences it at all, appears from the record to have been largely a result of his admitted pre-existing conditions or completely manufactured, such as his allegation, noted *infra*, regarding a broken neck. As noted *supra*, there are multiple references in the record regarding doubts and outright disbelief regarding any physiological reason for Plaintiff's symptoms. On March 13, 2016, while in medical observation on suicide watch, Plaintiff refused to sleep in his bed, preferring his wheelchair; the provider noted that he was "in stooped position bent down with his head in his knees" and the suicide "watcher" reported that he had "been in this position for hours." ECF No. 156-4 at 255. The provider noted that "[c]learly, he does not appear to be in constant pain contrary to his claim . . . [despite] demanding . . . to . . . [get] higher dose of gabapentin."[12] Id. On September 25, 2017, he was disciplined for "malingering, feigning illness." ECF No. 156-2 at 5 - 6.

It is apparent from the record that over time, Plaintiff has embellished and exaggerated his symptoms and/or details of the assault. See ECF No. 156-4 at 344 – 50 (at an October 17, 2017 neurology visit, Berryman advised that "his problems began when he

---

[12] Gabapentin (Neurontin) is an anticonvulsant medication also used to relieve nerve pain from various causes, such as postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles); the pain of diabetic neuropathy (numbness or tingling due to nerve damage in people who have diabetes). See Gabapentin, *available at* < https://medlineplus.gov/druginfo/meds/a694007.html >

was physically assaulted in May 2014 . . . [when] he was "stomped" while his hands were handcuffed behind his back . . . has reportedly been experiencing subjective right lower extremity weakness since that event . . . [and] that he was able to walk until November 2014. Since then, he has reportedly been using a wheelchair."); see also ECF No. 156-4 at 319 – 24 (at an April 10, 2017 neurosurgery consult for complaints of neck and back pain, diffuse arm and leg weakness, the neurosurgeon reported that "[p]atient notes a several year history of knee and back pain which he states date to May 2014 when a fellow inmate repetitively stepped on his neck while he was on the ground.").

After refusing medical care the day of the assault, years later, in his August 13, 2018 deposition, Berryman testified that immediately after the assault, he was in "so much pain, . . . [his] neck was swelled up . . . [he] knew . . . [his] neck had been broke." ECF No. 165-1 at 81. In his October 29, 2018 response in opposition, he claimed that he told a "young psychologist that he knew his neck was broken after he was assaulted by V.A." ECF No. 163-1 at 12. He also contended that a "Dr. Price" at FMC Butner told him his "neck had been broken" and on February 8, 2017 diagnosed him with cervical radiculopathy and myelopathy, and that soon after, another doctor also told him his neck had been broken and wanted to give him injections in his spine, which he refused.  Id. at 13. Even a cursory review the record reveals that Berryman's hands were *not* cuffed behind him during the assault;[13] his neck was never "repetitively stepped

---

[13] Nowhere in his verified complaint did Berryman ever allege that V.A. assaulted him while his hands were cuffed behind his back.  The two inmates were alone in their cell and had gone to bed before the assault occurred; Berryman would hardly have been cuffed under the circumstances.  Further, the contemporaneously-created Incident Report notes that upon staff's arrival, they witnessed V.A. assaulting Berryman, who was "laying on the ground with his hands over his head in a defensive posture . . . " ECF No. 156-2 at 122.

on," and was never broken, nor has any health care provider ever documented that he was told so.[14]

At some point prior to mid-February 2015,[15] Berryman began exhibiting drug-seeking behavior,[16] seeking narcotics, often specifically requested by name, when there was no medical evidence indicating a need for them. See ECF Nos. 156-4 at 104 – 05; 128 – 29; 146 – 50; 230 – 32; 258 - 61; 276 – 80; 284 – 87; 297 – 98;  299 – 301; 305 – 07; 316 – 18; 361 - 62; 363 – 65; 366 – 70; 371 - 72;  373 - 76; 395 – 96;  see also id. at 236 (Plaintiff, angry and agitated at not getting the drugs he wanted, stated "he wants to get shipped to a USP because he'll be able 'to get the strong shit.'").  He was briefly prescribed Tylenol[17] with codeine (Tylenol # 3, a narcotic) in early 2016 as a substitute for the gabapentin, which was temporarily unavailable, but the BOP physician noted its addictive potential and "would not allow this to be his analgesic of choice for an indefinite period of time." Id. at 234 - 35. He was finally prescribed Methadone (a narcotic) on July 1, 2016, the dose of which was increased at first and then later tapered and ultimately discontinued in June, 2018, much to his dissatisfaction. Id. at 276 – 80; 293 – 96; 302 – 04; 316 – 18; 361 – 62; 363 – 65; 371 - 72.

---

[14] A March 27, 2015 cervical spine CT scan of Berryman's neck reflected moderate cervical degenerative disc disease and osteoarthritis but no evidence of any fracture, recent or remote. ECF No. 156-4 at 133.

[15] The Defendants have provided excerpts, not Plaintiff's entire BOP medical record.

[16] Drug-seeking behavior typically includes repeated presentations seeking narcotic pain medications, complaining of headache, back pain, dental pain, requesting medication by name, requesting a refill of narcotics, benzodiazepines, or muscle relaxants (high risk medications for abuse ["HRM"]), reporting HRM as having been lost or stolen, reporting being out of HRM, reporting greater than 10/10 pain, and requesting HRM parenterally. See How Frequently are "Classic" Drug-Seeking Behaviors Used by Drug-Seeking Patients in the Emergency Department? available at < https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3556950/ >

[17] However, on March 11, 2016, when offered plain Tylenol to help with his alleged pain, he claimed he could not take Tylenol "due to a heart condition."  ECF No. 156-4 at 250 – 52.

Nonetheless, when Plaintiff perceived his needs were not being met, or not being met as quickly as he wanted, or he was angry at medical staff,[18] at times he refused all of his chronic care clinic medications, including the gabapentin he took for alleged nerve pain [id. at 120 – 21; 128 – 29], behavior inconsistent with someone actually in pain. Despite all of these complaints of assault-related pain, inexplicably, in a visit to an orthopedist for an initial evaluation of neck and back pain on January 19, 2016, Plaintiff denied "any specific injury to the neck or back[.]" Id. at 230 - 32.

Plaintiff's complaint alleges that the May 2014 assault caused him to develop 4 protruding disks in his lower lumbar back area with severe stenosis; lower lumbar thecal sac encroachments; a lumbar slipped disk; cervical spine stenosis from C6-C7; disk herniation

---

[18] The record is replete with examples of Berryman's acting out immediately, in often quite painful and/or unpleasant ways, when he did not get his own way. On August 7, 2013, Berryman was sanctioned for "misusing auth [sic] medication" [ECF No. 156-2 at 10]; he was disciplined for swallowing "numerous prescribed pills by not following instructions on pill bottle" on March 14, 2014 [ECF No. 156-2 at 9]; sanctioned for deliberately banging his head on his steel cell bars on August 14, 2013 because he did not want a cellmate [ECF No. 156-2 at 10]; on November 11, 2014, he was taken to an outside hospital for swallowing "he may have taken his self carry medications" and deliberately cutting his right groin area [ECF No. 156-4 at 76 – 79], because he "need[ed] to be seen[.]" Id. 82. On February 17, 2015, he swallowed 150 tablets metoprolol 50 mg tablets and 17 tablets of Isosorbid because his demand for pain medicine earlier that day had been refused. Id. at 104-116. On April 26, 2015, he cut a laceration to the antecubital space of his left arm and had to be taken to the emergency room [id. at 146 – 50]; and on June 19, 2015, he was treated for a self-inflicted cut to the antecubital space of his left arm. ECF No. 156-4 at 156. He was disciplined for swallowing a razor blade on November 22, 2015 [ECF No. 156-2 at 8; see also ECF No. 156-4 at 185, 188]; and admits to having previously cut his arm "to the bone," including "the artery [and] almost bleeding out,] to get the Warden's attention and get the medication and MRI that he wanted ordered. ECF No.163-1 at 5. He also embarked on protracted hunger strikes, sometimes for as long as 42 days at a time, when he did not get a particular course of medical treatment he wanted [ECF Nos. 156-4 at 29, 163, 211, 238, 273, 284, 291, 371, 373], and filed at least one grievance alleging that his "medical needs were not met leading to self harm." ECF No. 156-2 at 73. On January 25, 2016, he threatened to "hurt myself" if he did not receive Nubain, a narcotic. ECF No 156-4 at 230; on March 11, 2016, after pulling a muscle in his back, moving from the toilet to the wheelchair [id. at 250 – 51], when told could not be seen by medical until the following morning for his complaint of back pain, he threatened to "do what he had to do," and later claimed to have swallowed a razor blade [ECF No. 156-4 at 257]; he was taken to the emergency room, where the x-ray was negative for a foreign body and he received 3 Percocet tablets (narcotic) for his claim of back pain; he later admitted he had not swallowed the razor blade at all. Id. at 253, 256. On June 1, 2017, a nurse reported that he had ingested "numerous pills that could be Vit D or ntg. (ntg – nitroglycerine)" [id. at 317]; on February 28, 2018, he threatened to hang himself and wrapped a sheet around his neck [id. at 357]; on July 7, 2018, he was taken to a hospital emergency room after overdosing on milk of magnesia and a bottle of nitroglycerin tablets "due to dissatisfaction . . . with his living circumstances . . . [when his] meal tray . . . did not account for his vegan diet . . . subsequently . . .was seen to break the lid off . . . the nitroglycerin bottle and swallow this and . . .some shards of glass from the bottle . . . [and] also cut his left arm" with one of the shards of glass. ECF No. 156-4 at 378.

moderately encroaching upon the thecal sac at the C3-4 level; "hard disks/osteophyt [sic] complex thecal sac encroaching" C6-7; and evidence of remote rib fractures with rib deformity in the lower left ribs. ECF No. 1 at 17. There are no radiological imaging reports in the records provided that pre-date the May 8, 2014 assault, to document exactly what level of spinal osteoarthritis Plaintiff already had, but his pre-assault report of having "severe degenerations of his spine" [ECF No. 156-4 at 21] from having been run over by a car, thrown or trampled by a bull, auto accidents, gunshots, stabbing; and multiple traumatic injuries indicate that there was sufficient cause for it to be present.[19] Nonetheless, there is no contemporaneous evidence in the record, nor any allegation provided by Plaintiff at the time he filed his complaint, to sustain a claim of cervical or lumbar spine injury; Plaintiff *only* alleges his ribs were "stomped" in the assault, and the BOP staff members who witnessed the assault only describe blows to Plaintiff's head and upper torso. Therefore, the *only* injury later documented by any objective exam that could conceivably be considered related to the May 8, 2014 assault is the evidence of "remote" rib fractures finally found on a January 6, 2015 CT of the chest [ECF No. 156-4 at 96 – 98] after chest x-rays in October 24, 2014, December 5, 2014 [ECF Nos. 156-4 at 66, 94 – 95] failed to find any evidence of the same.[20]  While it is *possible* for acute rib fractures to be undetectable on x-ray, under those circumstances, the diagnosis of acute rib fracture can still be made clinically by exam; however, here, Plaintiff did not exhibit or complain of

---

[19] Sustaining a prior traumatic injury or fracture to a bone or joint greatly increases the risk of subsequently developing osteoarthritis in the area.  See  Post-Traumatic Arthritis: When Old Injuries Come Back to Haunt You, *available at* < https://www.everydayhealth.com/news/when-old-injuries-come-back-to-haunt-you/ >

[20] Subsequent x-rays have also failed to show the "remote" rib fractures.

the objective symptoms of a rib fracture[21] at the time of the assault or within the first six months thereafter.

Finally, in the past several years, Plaintiff has begun repeatedly refused offers of non-narcotic treatment for his alleged injuries, and refusing further diagnostic testing and/or surgery to diagnose and/or relieve his alleged pain, stating he will have his medical needs taken care of after he is released.[22]  See ECF Nos. 156-4 at 233; 236; 250 - 51; 299 – 300; 335 – 36; 351; 359 - 61; 366 – 67;[23] 395 – 96.  Such a stance hardly comports with someone who claims to be in constant, severe pain. Nevertheless, even if the "remote" rib fractures found in the January 2015 chest CT exam *were* related to the assault, such a finding is moot because as noted *supra*, the fact that Plaintiff was assaulted is not in dispute.

Berryman's response in opposition lists numerous points of disagreement with the Defendants' arguments, most of which are wholly inconsequential to the legal analysis or the Defendants' conclusions in their dispositive motion.  He expends much effort objecting to *minutiae*, seizing on tiny discrepancies in specific details about exact times various BOP staff

---

[21]  Although chest x-ray remains the most effective method of diagnosing rib fractures, approximately 25% of rib fractures do not show on x-ray and must be diagnosed by physical examination. Patient with rib fracture experience pain, especially on inspiration (inhaling) or during movement; they also exhibit tenderness on exam, and shallow breathing. A portion of the thoracic wall may move separately from the rest of the chest (flail chest). There is a grating sound during breathing or movement. Patients also exhibit symptoms of anxiety, restless or fear. They may complain of headache, feel dizzy, tired or sleepy. See Rib Fracture: Different Radiographic Projections, *available at* < https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3529706/ >

[22] The BOP's online Inmate Locator indicates that Plaintiff is due to be released on December 29, 2018. See < https://www.bop.gov/inmateloc/ >

[23] "**Findings on MRI did not account for pt's inability to stand and walk. Weakness UE also not explained by cervical MRI. Pt has had UE (upper extremity) EMG June 2017 showing carpal tunnel, no radiculopathy, however refused LE (lower extremity) EMG in March.** There has been a question of neuropathy vs radiculopathy however without EMG it is difficult to evaluate. **Pt does not want to have studies done since he will release in a few months**. In any case he is on full dose gabapentin for neuropathic pain. **He has an extensive ETOH (ethyl alcohol) hx and reports that he would much rather have ETOH than opiate.** Given hx as noted prior, risk of opiate outweighs benefit and will taper. Will work with pain management for alternatives and pt should be seen soon. This was discussed with pt who expresses understanding.  Continue full dose gabapentin." See ECF No. 156-4 at 366 – 67 (emphasis added). The undersigned finds it significant that Plaintiff was anxious to avoid having a diagnostic test that would likely prove that there was no physiological reason for his claimed inability to walk.

allege that they were notified of or arrived to break up the fight [ECF No. 163-1 at 10 - 11, 16 - 17]; arguing that he is never the one who starts fights [id. at 6]; making new and unrelated allegations about other assaults not at issue here [id. at 6 – 7]; disputing the number of grievances he filed at USP Hazelton [id. at 14], and other such technicalities, but does not explain how such minor discrepancies, even if true, would materially alter the legal analysis of his claims or the relevant issue of Defendants' alleged failure to protect him.

He also attempts to walk back on numerous statements he made to medical providers over the years regarding his many prior injuries to his back, spine, and musculoskeletal system, denying that he ever claimed to have any [id. at 12]; and attempts to point out non-existent inconsistencies in the Defendants' version of events and their original and supplemental declarations, to create genuine issues of material fact where none exist, inadvertently providing more inconsistencies of his own while doing so.[24] Id. at 15 – 16, 18 – 19.

_____

[24] For instance, Plaintiff contends that Officer Harrison's Declaration [ECF No.  52-6 at 2] falsely states that both inmates submitted to being cuffed after the incident; he argues that he was not cuffed after the incident, because he was unconscious on the floor; was awakened by Officer Mullen and was walked to the observation cell by Mullen and left there. ECF No. 163-1 at 5 – 6.  However, the photos provided by Defendants show Plaintiff cuffed behind his back at 3:35 a.m. on May 8, 2014 and Mullen's first declaration denies Plaintiff's allegations regarding having assisted him to an observation cell after the assault.

He also claimed he "never took narcotic drugs befor[e] arriving in the B.O.P.[.]" Id. at 12.  However, during a March 5, 2015, BOP Health Services Clinical Encounter at FCI Florence, while attempting to persuade a provider to prescribe him a narcotic for back pain, after refusing the offer of over-the-counter ("OTC") Tylenol because it "did not have codeine" in it, he argued that "he used to take hands full of narcotics in [sic] the outside," and now . . . [he's] only asking for T3 (Tylenol with codeine)" but would "settle for an increase in the doses of Neurontin instead." ECF No. 156-4 at 128.

Further, despite his claim that he "has not injured his back or neck once since he was assaulted by V.A. [id. at 13]" his medical records show otherwise.  He was involved in the altercation with inmate Dunn on July 21, 2014, sustaining contusions to his face. Id. at 47 – 49.  On March 2, 2015, he was seen by Health Services, reporting that he had dislocated his back while climbing out of his bunk. Id. at 120. On April 9, 2015, he reported that he was pushed out of his wheelchair, further injuring his back. Id. at 136-37. On April 10, 2015, he was noted to be moving all extremities without difficulty after falling or having been thrown from his wheelchair. ECF No. 156-4 at 145. On December 9, 2015, he reported having "popped a rib loose" transporting himself in his wheelchair. Id. at 222. On March 11, 2016, he reported pulling a muscle in his back, moving from the toilet to the wheelchair.  Id. at 250 – 51. On October 12, 2016, he rolled out of bed and fell to the floor, and thereafter complained of pain "all over." Id. at 288. On January 26, 2017, he hurt his neck reaching for something, and reported feeling his neck "pop." Id. at 302. On September 21, 2017, he hurt his back when the wheelchair slipped from under him as he was trying to get out of bed and he fell to the floor; he was able to get himself back into the wheelchair and push the wheelchair himself. He complained of low back pain but had no apparent injuries and  refused treatment. Id. at 339. On October 5, 2017, he fought with another inmate, but denied having any injuries. Id. at 342.

At his deposition, Berryman testified that "I don't believe I'd be in this wheelchair right now because *I had no problems with my back until that man stomped me* . . . If they would have moved me, as I was requesting, I wouldn't be in this chair."  ECF No. 165-1 at 95 (emphasis added).  However, the record before the undersigned does not support Plaintiff's claims. As a preliminary point, Plaintiff's claim was that his ribs were stomped and he was "knocked unconscious" is not supported by the contemporaneously-created Incident Report; however, the Incident Report does document that V.A. was witnessed kicking Plaintiff in the head and upper torso, and the photos and Plaintiff's May 8 and May 15, 2014 medical records support that Plaintiff sustained minor injuries, consistent with that.  Nowhere has Plaintiff *ever* alleged that he was kicked in the lower back, nor was any such attack witnessed in the assault, which was broken up within 2 or 3 minutes from the time Plaintiff first hit the emergency button.  Nonetheless, Plaintiff continues to attempt to connect findings on post-assault radiology reports of his lumbar spine, issued years after-the-fact, reports that merely corroborate the natural age-related progression to be expected from Plaintiff's own reported pre-existing "severe" arthritic spinal conditions, likely mainly attributable to traumatic injuries sustained prior to incarceration.[25]

In this case, the parties have all presented sworn affidavits.  Affidavits must be based on the personal knowledge of the affiant and "set out facts that would be admissible in evidence."

---

[25] On June 25, 2013, he admitted to having pre-existing extensive degenerative arthritic disease in his spine and hips, from  "severe degenerations" of the spine, right hip, and right knee, with musculoskeletal pain in his hip, "joint," knee, and low back, attributed to injuries he reported from multiple fractures in the past, from being run over by car, shot, stabbed, and having had his right foot "completely broke at 90 degree angle [ECF No. 156-4 at 21];" health staff diagnosed him as having "chronic pain due to trauma." Id. Further, Plaintiff sustained other musculoskeletal injuries in the BOP before the May 2014 attack: on August 7, 2013, he fought with a cellmate, sustaining multiple injuries to his face and head, reporting that his cellmate "hit my cheek and then my forehead on the bunk [id. at 24];" on January 9, 2014, he reported that his back had "popped" and he had increasing low back pain radiating to his right hip and leg since bending over to pick something up a week earlier [id. at 27]; and during a November 16, 2014 Health Services visit for a self-inflicted wound to the groin, he reported having broken his back while bull riding in the past, and also having been "shot between the eyes." Id. at 82 – 86.

Fed.R. Civ.P. 56(c)(4) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. Visser v. Packer Eng. Assoc., Inc., 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and   opinions [in an affidavit] must be grounded in observation or other first-hand personal experience . . . not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." Visser, 924 F.2d at  659.  Here, all of the Defendants' affidavits conflict with the Plaintiff's.

Summary judgment "may not be invoked where, as here, the affidavits present conflicting versions of the facts which require credibility determinations."  Mann v. Failey, 578 Fed. Appx. 267, 274, 2014 U.S. App. LEXIS 13666, *17-18, 2014 WL 3511878 (4th Cir. 2014) *quoting* Davis v. Zahradnick, 600 F.2d 458, 460 (4th Cir. 1979). However, credibility determinations may sometimes be made on a written record without live testimony; specifically, there is no prohibition against a court making credibility determinations based on competing affidavits in certain circumstances. See  Strong v. Johnson, 495 F.3d 134, 139-140, 2007 U.S. App. LEXIS 17458, *11-12 (4th Cir. 2007) *citing* Tanberg v. Sholtis, 401 F.3d 1151, 1161 (10th Cir. 2005); United States v. Barsanti, 943 F.2d F.2d 428, 440 (4th Cir. 1991). For instance, "when, as here, an affidavit contains unsupported, conclusory statements, it may be discounted by the court." United States v. Perez,  393 F.3d 457, 464 (4th Cir. 2004); see also Shane v. Greyhound Lines, Inc., 868 F.2d 1057, 1061 (9th Cir. 1989) (conclusory allegations in an affidavit, not backed up by statement of fact, cannot defeat a motion for summary judgment); Lechuga v. Southern Pacific Transp. Co., 949 F.2d 790, 798, 1992 U.S. App. LEXIS 6, *21-22, 21 Fed. R. Serv. 3d (Callaghan) 1398 (5th Cir. 1992) (conclusory statements in an affidavit do not provide facts that will counter summary judgment evidence).

After thorough review of the voluminous record, the undersigned is of the opinion that it is clear that the details of Berryman's claims are constantly changing and have no support in the record.  Berryman is frequently untruthful when he believes it serves his interests; at times, he even admits as much.[26] The undersigned does not find it credible that Berryman, given his past behavior when he did not get his own way, would not have immediately complained vigorously to anyone who would listen, if he actually believed his cellmate posed a danger to him  in May, 2014. There is no proof in the record that he did so.

Before they can be found to have acted with deliberate indifference in failing to protect Plaintiff, there must be proof that Defendants were aware of the risk of serious harm. Farmer v. Brennan, *supra* at 836. Simply stated, Defendants cannot be found to have consciously disregarded a risk of which they had no prior knowledge. Whitley v. Albers, *supra* and Moore v.

---

[26] For instance, in his deposition, Berryman insisted that he never got any medical care for his injuries from the May 8, 2014 attack while he was at USP Hazelton. ECF No. 165-1 at 83. His medical records prove that he was seen by USP Hazelton Health Services at least eight times and hospitalized at least once (for chest pain that subsided after nitroglycerin) between May 8, 2014 and October 7, 2014, when he was finally transferred out of Hazelton.  See ECF Nos. 156-4 at 31 – 33, 34 – 35, 37; 42 – 42, 43 – 46, 47 – 49, 50 – 52, 55 - 60, 61 – 62.

    At his deposition, Berryman testified  that "you could not get a grievance when you were in the SHU . . . You couldn't file a grievance.  They wouldn't let you."  ECF No. 165-1 at 39 - 40.  Nonetheless, Berryman's Inmate History Quarters Report shows that Berryman's entire USP Hazelton stay, from March 10, 2014 until October 7, 2014, was spent in the SHU [ECF No. 156-2 at 33 – 34] and that while there, he managed to file 17 grievances between June 19, 2014 and October 7, 2014.  See ECF No. 156-2 at 64 – 74.

    In Berryman's March 12, 2016 psychiatry/psychology Competency and Responsibility Evaluation, deeming him competent, despite his admitted history of self-harm and initiating hunger strikes as intentional "behavior measures necessary" to achieve his goals, such as obtaining desired medical attention, the psychologist noted that "[h]is actions were not the result of delusional thinking or other psychotic symptoms. He is able to distinguish right from wrong and has a sound understanding of the disciplinary process. However, he doesn't necessarily view his behavior in terms of right versus wrong."  ECF No. 156-3 at 35.

    As noted *supra*, another example of admitted deception is Berryman's March 11, 2016 claim to have swallowed the razor blade in order to get a trip to the emergency room and narcotics; he later admitted he had made it up.  ECF No. ECF No. 156-4 at 253, 256 - 57.

    Finally, a March 26, 2018 BOP Psychology Services Post Suicide Watch Report noted that Berryman's then-most recent threats to harm himself  were a "maladaptive strategy to gain preferred circumstances," that he had "a documented history" of such behavior, the "main outcome of which  . . .[was] disruption to the orderly operation of the institution, misallocation of resources, and inappropriately reinforcing him so that he continues to use [these methods] in the future."  ECF No. 156-3 at 48. The psychologist also noted that Berryman's "diagnoses of antisocial and narcissistic personality disorders and classification as a care3-mh inmate (BOP medical classification for an inmate who does not meet the criteria for inpatient psychiatric condition; see < https://www.bop.gov/foia/docs/medicalclassificationguidelines.pdf >) were considered and appear appropriate." Id.

Winebrenner, *supra*. Plaintiff's verified complaint and sworn declarations notwithstanding[27] the record does not demonstrate that any of the Defendants had reason to know of a substantial risk to Plaintiff's safety prior to the assault.  There is no basis in the record to conclude that any of the Defendants acted unreasonably or with deliberate indifference toward Plaintiff, and thus, they are entitled to qualified immunity. For the reasons stated above, the undersigned finds that Berryman's bare allegations, including those made in each of his sworn affidavits, do not raise any genuine issue of material fact and his claim regarding the Defendants' failure to protect him is simply not plausible.

## V. Recommendation

For the reasons stated above, the undersigned hereby recommends that Defendants' Motion for Summary Judgment [ECF No. 155] be **GRANTED**  and the Plaintiff's complaint be **DISMISSED with prejudice for failure to state a claim upon which relief can be granted** under 28 U.S.C. 1915(e)(2)(B)(i) as to all Defendants.

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made. Objections shall identify each portion of the magistrate judge's recommended disposition that is being challenged and shall specify the basis for each objection.  Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12. A copy of any objections shall also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court**

---

[27] Plaintiff's complaint and sworn declarations consist of conclusory allegations that either conflict with each other or are otherwise unsupported by the record.

**based upon such recommendation**. 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, at his last known address as reflected on the docket, and to transmit a copy electronically to all counsel of record.

This Report and Recommendation completes the referral from the district court. The Clerk is directed to terminate the Magistrate Judge's association with this case.

DATED: December 11, 2018

/s/ *Michael John Aloi*

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE